## HEYDENFELDT v. DANEY GOLD AND SILVER MINING COMPANY.

1. At the time of the passage of the Nevada Enabling Act, approved March 21, 1864 (13 Stat. 30), sections 16 and 36 in the several townships in Nevada had not been surveyed, nor had Congress then made, or authorized to be made, any disposition of the public domain within her limits.

2. The words of present grant in the seventh section of that act are restrained by words of qualification which were intended to protect the proposed new State against loss that might happen through the subsequent action of Congress in selling or disposing of the public domain. If by such sale or disposal the whole or any part of the sixteenth or thirty-sixth section in any township, was lost to the State, she was to be compensated by other lands equivalent thereto, in legal subdivisions of not less than one-quarter section each.

3. A qualified person, whose settlement on mineral lands which embrace a part of either of said sections was prior to the survey of them by the United States, and who, on complying with the requirements of the act approved July 26, 1866 (14 Stat. 251), received a patent for such lands from the United States, has a better title thereto than has the holder of an older patent therefor from the State.

4. The legislative act of Nevada, of Feb. 13, 1867, recognized the validity of the claim of the United States to the mineral lands within that State.

ERROR to the Supreme Court of the State of Nevada.

This is an action of ejectment brought by Heydenfeldt in the District Court of the First Judicial District of Nevada, against the Daney Gold and Silver Mining Company. The case was tried by the court, which found the following facts : —

On the fourteenth day of July, 1868, the State of Nevada issued to one William Webelhuth its patent for the west half of the south-west quarter of section 16, township 16 north, range 21 east (lying in Lyon County, State of Nevada), Mount Diablo base and meridian, containing eighty acres, according to the official plat of the survey of public lands as made by the United States surveyor-general for the district of Nevada; which said patent was recorded in the recorder's office of the county of Lyon on the twenty-fifth day of July, 1868, and was issued by the State authorities, under and by virtue of the statute of Nevada, conveying lands assumed to have been granted to the State by the act of Congress approved March 21, 1864, entitled "An Act to enable the people of the Territory of Nevada to form a State government upon certain conditions."

On the eighteenth day of August, 1873, William Webelhuth, by deed of conveyance duly signed, sealed, and acknowledged, conveyed the same premises to one Philip Kitz, which deed was recorded in the recorder's office of the county of Lyon Jan. 13, 1874.

On the ninth day of January, 1874, Philip Kitz, by deed duly signed, sealed, and acknowledged, conveyed the same premises to this plaintiff, which said deed was duly recorded in the recorder's office of the county of Lyon on the same day.

The defendant is in the possession of the premises. The plaintiff, prior to bringing this action, demanded the possession thereof, but the same was refused.

On the second day of March, 1874, the United States, by its proper authorities, granted to the defendant, by its patent, in due and regular form, lot No. 72, embracing a portion of section 16, in township 16 north of range 21 east, Mount Diablo meridian, in the Devil's Gate mining district, in the county of Lyon and State of Nevada, in the district of lands subject to sale at Carson City, embracing thirteen (13) acres and seventy-eight one hundredths ($\frac{78}{100}$) of an acre, more or less, with the exclusive right of possession and enjoyment of all the land included within the exterior lines of the survey of said premises not expressly excepted, and of two thousand linear feet of Mammoth Lode ledge, vein, or deposit for said two thousand

feet therein throughout its entire depth, &c., which said grant by the patent covers and includes the lands and premises sought to be recovered by the plaintiff from the defendant in this action, and which said patent was so issued to the defendant under and by virtue of the act of Congress approved July 26, 1866, entitled " An Act granting the right of way to ditch and canal owners over the public land, and for other purposes ; " the act amendatory thereof, approved July 9, 1870, and the act approved May 10, 1872, entitled " An Act to promote the development of the mining resources of the United States."

The land in controversy is mineral land, containing precious metals, and the defendant is in possession and is conducting and carrying on the business of mining thereon, having in the prosecution of mining erected and constructed improvements of the value of over $80,000.

In 1867, and prior to the date of the survey or approval of the survey of section 16, township 16 north, range 21 east, by the United States, the defendant's grantors and predecessors in interest had entered upon the premises described by plaintiff in his complaint for mining purposes, and had claimed and occupied the same in conformity to the laws, customs, and usages of miners in the locality and mining district in which said premises are situated, and were so possessed and engaged in mining thereon when the said land was first surveyed, and when the State of Nevada issued its patent as aforesaid to William Webelhuth.

Thereupon, as conclusions of law, the court found, —

The act of Congress approved March 21, 1864, enabling the people of the Territory of Nevada to form a constitution, &c., under and by virtue of which act the State of Nevada selected the land, and sold and conveyed the same to the predecessors in interest of the plaintiff, did not constitute a grant *in præsenti*, but an inchoate, incomplete grant until the premises were surveyed by the United States, and the survey properly approved.

Said survey and the approval thereof not having been made prior to the entry thereon and claim thereto by defendant's predecessors in interest for mining purposes, the same was not

by said act of Congress, or in any other manner, ever granted by the United States to the State of Nevada.

The entry of defendant's grantors thereon for mining purposes, and their rights thereto having become established prior to the survey of said section by the United States, the said premises were not included within, and did not pass to the State of Nevada, by the granting clause contained in said act of Congress of March 21, 1864, but, on the contrary, were excluded therefrom by reason of their having been previously possessed and occupied by defendant's grantors for mining purposes, in conformity with the mining laws, rules, and customs of miners in the locality where the same was situated, and in conformity with the act of Congress approved July 26, 1866, granting the right of way to ditch and canal owners over the public lands, and for other purposes.

Thereupon judgment was rendered for the defendant. The Supreme Court of Nevada having affirmed it, the plaintiff sued out this writ of error.

Submitted on printed arguments by *Mr. W. E. F. Deal* for the plaintiff in error, and by *Mr. C. E. De Long* for the defendant in error.

MR. JUSTICE DAVIS delivered the opinion of the court.

The validity of the patent from the State under which the plaintiff claims title rests on the assumption that sections 16 and 36, whether surveyed or unsurveyed, and whether containing minerals or not, were granted to Nevada for the support of common schools by the seventh section of the Enabling Act, approved March 21, 1864, 13 Stat. 32, which is as follows : " That sections numbered 16 and 36 in every township, and where such sections have been sold or otherwise disposed of by any act of Congress, other lands equivalent thereto, in legal subdivisions of not less than one quarter-section, and as contiguous as may be, shall be, and are hereby, granted to said State for the support of common schools."

This assumption is not admitted by the United States, who, in conformity with the act of Congress of July 26, 1866, 14 id. 251, issued to the defendant a patent to the land in controversy, bearing date March 2, 1874. Which is the bet-

ter title is the point for decision. As it has been the settled policy of the government to promote the development of the mining resources of the country, and as mining is the chief industry in Nevada, the question is of great interest to her people.

It is true that there are words of present grant in this law; but, in construing it, we are not to look at any single phrase in it, but to its whole scope, in order to arrive at the intention of the makers of it. " It is better always," says Judge Sharswood, " to adhere to a plain common-sense interpretation of the words of a statute, than to apply to them refined and technical rules of grammatical construction. *Gyger's Estate*, 65 Penn. St. 312. If a literal interpretation of any part of it would operate unjustly, or lead to absurd results, or be contrary to the evident meaning of the act taken as a whole, it should be rejected. There is no better way of discovering its true meaning, when expressions in it are rendered ambiguous by their connection with other clauses, than by considering the necessity for it, and the causes which induced its enactment. With these rules as our guide, it is not difficult, we think, to give a true construction to the law under consideration.

Congress, at the time, was desirous that the people of the Territory of Nevada should form a State government, and come into the Union. The terms of admission were proposed, and, as was customary in previous enabling acts, the particular sections of the public lands to be donated to the new State for the use of common schools were specified. These sections had not been surveyed, nor had Congress then made, or authorized to be made, any disposition of the national domain within that Territory.

But this condition of things did not deter Congress from making the necessary provision to place, in this respect, Nevada on an equal footing with States then recently admitted. Her people were not interested in getting the identical sections 16 and 36 in every township. Indeed, it could not be known until after a survey where they would fall, and a grant of quantity put her in as good a condition as the other States which had received the benefit of this bounty. A grant, oper-

ating at once, and attaching prior to the surveys by the United States, would deprive Congress of the power of disposing of any part of the lands in Nevada, until they were segregated from those granted.   In the mean time, further improvements would be arrested, and the persons, who prior to the surveys had occupied and improved the country, would lose their possessions and labor, in case it turned out that they had settled upon the specified sections.   Congress was fully advised of the condition of Nevada, of the evils which such a measure would entail upon her, and of all antecedent legislation upon the subject of the public lands within her bounds.   In the light of this information, and surrounded by these circumstances, Congress made the grant in question.   It is ambiguous; for its different parts cannot be reconciled, if the words used receive their usual meaning.   *Schulenberg* v. *Harriman*, 21 Wall. 44, establishes the rule that " unless there are other clauses in a statute restraining the operation of words of present grant, these must be taken in their natural sense."   We do not seek to depart from this sound rule; but, in this instance, words of qualification restrict the operation of those of present grant.   Literally construed, they refer to past transactions; but evidently they were not employed in this sense, for no lands in Nevada had been sold or disposed of by any act of Congress.   There was no occasion of making provision for substituted lands, if the grant took effect absolutely on the admission of the State into the Union, and the title to the lands then vested in the State.   Congress cannot be supposed to have intended a vain thing, and yet it is quite certain that the language of the qualification was intended to protect the State against a loss that might happen through the action of Congress in selling or disposing of the public domain.   It could not, as we have seen, apply to past sales or dispositions, and, to have any effect at all, must be held to apply to the future.

This interpretation, although seemingly contrary to the letter of the statute, is really within its reason and spirit.   It accords with a wise public policy, gives to Nevada all she could reasonably ask, and acquits Congress of passing a law which in its effects would be unjust to the people of the Territory.   Besides, no other construction is consistent with the statute as a whole,

and answers the evident intention of its makers to grant to the State *in præsenti* a quantity of lands equal in amount to the 16th and 36th sections in each township. Until the *status* of the lands was fixed by a survey, and they were capable of identification, Congress reserved absolute power over them; and if in exercising it the whole or any part of a 16th or 36th section had been disposed of, the State was to be compensated by other lands equal in quantity, and as near as may be in quality. By this means the State was fully indemnified, the settlers ran no risk of losing the labor of years, and Congress was left free to legislate touching the national domain in any way it saw fit, to promote the public interests.

It is argued, that, conceding the soundness of this construction, the defence cannot be sustained, because the land in controversy was not actually sold by direction of Congress until after the survey. This position ignores a familar rule in the construction of statutes, that they must be so construed as to admit all parts of them to stand, if possible. 1 Bouv. Inst. p. 42, sect. 7. The language used is, " sold or otherwise disposed of by any act of Congress." The point made by the plaintiff would reject a part of these words, and defeat one of the main purposes in view. Congress knew, as did the whole country, that Nevada was possessed of great mineral wealth, and that lands containing it should be disposed of differently from those fit only for agriculture. No method for doing this had then been provided; but Congress said to the people of the Territory, " You shall, if you decide to come into the Union, have for the use of schools sections numbered 16 and 36 in every township, if on survey no one else has any valid claim to them; but until this decision is made and the lands are surveyed, we reserve the right either to sell them or dispose of them in any other way that commends itself to our judgment. If they are sold or disposed of, you shall have other lands equivalent thereto." The right so reserved is subject to no limitation, and the wisdom of not surrendering it is apparent. The whole country is interested in the development of our mineral resources, and to secure it adequate protection was required for those engaged in it. The act of Congress of July 26, 1866, *supra,* passed before the land

in controversy was surveyed, furnishes this protection, by disposing of the mineral lands of the United States to actual occupants and claimants, and providing a method for the acquisition of title. The defendant, and those under whom it claims, occupied the land prior to the survey, and were entitled to purchase. The patent subsequently obtained from the United States relates back to the time of the original location and entry, and perfects their right to the exclusion of all adverse intervening claims.

These views dispose of this case; but there is another ground equally conclusive. Congress, on the 4th of July, 1866, 14 Stat. 85, by an act concerning lands granted to the State of Nevada, among other things, reserved from sale all mineral lands in the State, and authorized the lines of surveys to be changed from rectangular, so as to exclude them. This was doubtless intended as a construction of the grant under consideration; but whether it be correct or not, and whatever may be the effect of the grant in its original shape, it was clearly competent for the grantee to accept it in its modified form, and agree to the construction put upon it by the grantor. The State, by its legislative act of Feb. 13, 1867, ratified that construction, and accepted the grant with the conditions annexed.

We agree with the Supreme Court of Nevada, that this acceptance "was a recognition by the legislature of the State of the validity of the claim made by the government of the United States to the mineral lands."

It is objected that the constitution of Nevada inhibited such legislation; but the Supreme Court of the State, in the case we are reviewing, held that it did not, 10 Nev. 314; and we think their reasoning on this subject is conclusive.

*Judgment affirmed.*