## BEECHER *v.* WETHERBY.

1. It was an unalterable condition of the admission of Wisconsin into the Union, that, of the public lands in the State, section 16 in every township, which had not been sold or otherwise disposed of, should be granted to her for the use of schools.

2. Whether the compact with the State constituted only a pledge of a grant *in futuro,* or operated to transfer to her the sections as soon as they could be identified by the public surveys, the lands embraced within them were set apart from the public domain, and could not be subsequently diverted from their appropriation to the State. If any further assurance of title was required, the United States was bound to provide for the execution of proper instruments transferring to the State the naked fee, or to adopt such other legislation as would secure that result.

3. The right of the Menomonee Indians to their lands in Wisconsin was only that of occupancy; and, subject to that right, the State was entitled to every section 16 within the limits of those lands.

4. The act of Congress approved Feb. 6, 1871 (16 Stat. 404), authorizing a sale of the townships set apart for the use of the Stockbridge and Munsee Indians, and originally forming a part of the lands of the Menomonees, does not apply to sections 16.

ERROR to the Circuit Court of the United States for the Eastern District of Wisconsin.

This was replevin by Beecher to recover from Wetherby, James, and Stille, saw-logs, cut and taken by them during the winter of 1872 and 1873, from section 16, township 28, range 14 east, in Wisconsin. The plaintiff asserts title to the land under patents from the United States bearing date Oct. 10, 1872; and the defendants, under patents from that State of Dec. 15, 1865, and Sept. 26, 1870.

Under the eighth article of the treaty of Aug. 19, 1825, 7 Stat. 272, the Menomonee lands were declared to be "bounded on the north by the Chippewa country, on the East by Green Bay and Lake Michigan, extending as far south as Milwaukee River, and on the West they claim to Black River." The lands in question are embraced in this tract.

A treaty concluded with the Menomonees Feb. 8, 1831, id. 342, confirming those boundaries, was ratified by the Senate, with a proviso that two townships on the east side of Winnebago Lake should be ceded for the use of the Stockbridge and Munsee Indians.

By a treaty concluded Oct. 18, 1848, and ratified Jan. 23, 1849, 9 id. 952, the Menomonees agreed to cede to the United States all their lands in Wisconsin. The eighth article stipulated that they should be permitted to remain on the ceded lands for the period of two years, and until the President should notify them that the same were wanted.

The act to enable the people of Wisconsin Territory to form a Constitution and State government, and for the admission of such State into the Union, approved Aug. 6, 1846, id. 56, provides " that section numbered 16 in every township of the public lands in said State, and, when such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said State for the use of schools."

The convention called to form a constitution, on the first day of February, 1849, accepted the proposition contained in the organic act. Rev. Stat. Wis. 1849, p. 45. By an act entitled " An Act for the admission of the State of Wisconsin into the Union," approved May 29, 1848, id. 233, such acceptance was assented to by Congress.

A joint resolution of the legislature of Wisconsin, approved Feb. 1, 1853, Gen. Laws of Wis. 1853, p. 110, gives the assent of that State " to the Menomonee nation of Indians to remain on the tract of land set apart for them by the President of the United States, on the Wolf and Oconto Rivers, and upon which they now reside, the same being within the State of Wisconsin aforesaid, and described as follows, to wit : Commencing at the south-east corner of town 28 north, range 19, running thence west thirty miles, thence north eighteen miles, thence east thirty miles, thence south eighteen miles to the place of beginning."

On the 12th of May, 1854, 10 Stat. 1064, a treaty was made with the Menomonees, " supplementary and amendatory" to that ratified Jan. 23, 1849, wherein it is recited that, " upon mani-

festation of great unwillingness on the part of said Indians to remove to the country west of the Mississippi River, &c., which had been assigned to them, and a desire to remain in the State of Wisconsin, the President consented to their locating temporarily upon the Wolf and Oconto Rivers;" and, "to render practicable the stipulated payments therein recited, and to make exchange of the lands given west of the Mississippi for those desired by the tribe, and for the purpose of giving them the same for a permanent home, these articles are entered into." By the second article of said treaty, the following-described tract lying on Wolf River in the State of Wisconsin was ceded to the Indians to be held as Indian lands are held: "Commencing at the south-east corner of town 28 N., R. 16 E., 4th principal meridian, running west twenty-four miles, thence north eighteen miles, thence east twenty-four miles, thence south eighteen miles to the place of beginning, the same being townships 28, 29, and 30 of ranges 13, 14, 15, and 16, according to public survey."

Under an act of Congress approved Feb. 6, 1871, 16 Stat. 404, entitled "An Act for the relief of the Stockbridge and Munsee tribe of Indians in the State of Wisconsin," the two townships set apart for their use, including the section upon which the logs were cut, and forming a part of the Menomonee lands, were sold by the United States, and the plaintiff deraigns title under its patents.

The exterior lines of the township in which the land in question is situate were run in October, 1852, and the section lines in May and June, 1854.

There was a judgment for the defendants. The plaintiff then brought the case here.

*Mr. Charles W. Felker* for the plaintiff in error.

The act was in the nature of an executory agreement, and by its terms no title to sections numbered 16 could vest in the State until they were surveyed and designated on the plats filed in the surveyor-general's office. The sectional or subdividing lines of the township in question were not run prior to the treaty of May 12, 1854. The proviso to the act implies a reserved power in the government to sell or dispose of sections 16 while they remained a part of the public domain, and that

treaty did not reserve any section, but appropriated the entire tract as a reservation, and vested the title thereto in the Indians. *Meade.* v. *United States*, 2 Ct. of Cl. 224; *United States v. Brooks*, 10 How. 442. The State took title to none but public land. Land like that in question, continuously and rightfully in the occupation of an Indian tribe under authority of the government, is not "public" within the meaning of the grant. Mr. Justice Davis, in *Newhall* v. *Sanger*, 92 U. S. 761, justly remarked, that the words "public lands" "are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws." The treaty ratified Jan. 23, 1849, allowed the Indians to remain upon the lands for two years, and until the President should give notice that they were wanted. His subsequent act setting them apart as a reservation was a specific appropriation of them. Not having then been surveyed, no right of the State to sections 16 within the reservation vested, and they have never since become "public lands." *Wilcox* v. *Jackson*, 13 Pet. 498; *Cooper* v. *Roberts*, 18 How. 173; *Leavenworth, &c. Railroad Co.* v. *United States*, 92 U. S. 733; *Spaulding et al.* v. *Martin*, 11 Wis. 262.

The cession to the United States of two townships in the reservation does not affect the principle contended for: they were in fact ceded for a reservation for the Stockbridge and Munsee Indians, and did not become a part of the public lands. Neither is it material that they were, by the act of Feb. 6, 1871, directed to be sold for the benefit of those Indians. The relation of the United States to the property is the same. 16 Stat. 404; *Leavenworth, &c. Railroad Co.* v. *United States, supra.*

*Cooper* v. *Roberts*, 18 How. 173, is not in conflict with these views. There the lands had not been legally appropriated by the government before the title of the State vested.

The position that the title did not vest in the State until the lands were surveyed and the townships subdivided is not affected by the fact that the subdivision was made in June, 1854, before the treaty of May 12 was ratified by the Senate Aug. 2 of that year. The rights of no innocent third parties intervening, the treaty took effect by relation from the day of its date. *United States* v. *Arredondo*, 6 Pet. 691.

It cannot be claimed that the defendants are innocent purchasers. The patents under which they claim were issued, the one over eleven, and the other over sixteen years, after that treaty was made, and they bought with knowledge of it.

If it should be held, however, that the survey was made before that treaty was concluded, the eighth article of the treaty of Oct. 18, 1848, and the acts of the President subsequent thereto, were a legal impediment to the vesting of any title in the State.

But if the State ever had any interest, contingent or otherwise, in section 16 in each township of this Indian reservation, such interest was waived by the resolution of the legislature of Feb. 1, 1853. An estoppel is available against the State. Bigelow, Estoppel, 276, 277, and cases cited.

*Mr. W. P. Lynde* and *Mr. Charles Barber*, contra.

The act of Congress of Aug. 6, 1846, did not constitute a present grant, but was in the nature of an executory agreement. *Rutherford* v. *Greene's Heirs*, 2 Wheat. 196; *Cooper* v. *Roberts*, 18 How. 173; *Schulenberg* v. *Harriman*, 21 Wall. 44; *Leavenworth, &c. Railroad Co.* v. *United States*, 92 U. S. 733; *Sherman* v. *Buick*, 93 id. 209; *Heydenfeldt* v. *Daney Gold and Silver Mining Co.*, id. 634; 8 Opin. Atty.-Gen. 260; *Houghton* v. *Higgins*, 25 Cal. 255.

At the time of the survey in October, 1852, and the subdivision in May and June, 1854, no legal impediment existed to the complete investiture of the title of the State. *Heydenfeldt* v. *Daney Gold and Silver Mining Co.*, supra.

The fee to the land was in the United States, subject, in respect to a part, to the right of occupancy by the Menomonees when Congress passed the enabling act of 1846. It was the obvious intention that the grant should be executed from time to time, as that right was extinguished and the surveys designated the sections.

From the origin of the government it had been settled that the United States might make a valid grant of lands to which the Indian right had not been extinguished, and that such a grant passed the title subject to that right. *Fletcher* v. *Peck*, 6 Cranch, 87; *Clark* v. *Smith*, 13 Pet. 195; *The Cherokee Nation* v. *Georgia*, 5 Pet. 1; *Johnson* v. *McIntosh*, 8 Wheat.

543; 8 Opin. Atty.-Gen. 262; *Veeder et al.* v. *Guppy*, 3 Wis. 502.

The argument of the plaintiff, that the joint resolution of 1853 operated as a grant of the sixteenth section, is based upon the assumed fact that the title was then in the State. Even if this were correct, the joint resolution is for the following, among other, reasons unconstitutional and void: First, because in Wisconsin such a resolution is simply an expression of opinion binding on no one, and without the force of law. Const. of Wis., art. 4, sect. 1; Cooley, Const. Lim. 130, 131. Second, because it does not contain the enacting clause required by the Constitution of the State, and is not a bill. Const. of Wis., art. 4, sect. 17; Rev. Stat. Wis. 1858, p. 30.

MR. JUSTICE FIELD delivered the opinion of the court.

This was an action of replevin brought by the plaintiff to recover two million feet of pine saw-logs of the estimated value of $25,000, alleged to be his property, and to have been wrongfully detained from him by the defendants. The complaint was in the usual form in such cases, and the answer consisted of a general denial of its averments. The logs were cut by the defendants from the tract of land in Wisconsin which constitutes section sixteen (16), in township twenty-eight (28), range fourteen (14), in the county of Shawano, in that State. The plaintiff claimed to be the owner of the logs by virtue of sundry patents of the land from which they were cut, issued to him by the United States in October, 1872. The defendants asserted property in the logs under patents of the land issued to them by the State of Wisconsin in 1870. The question for determination, therefore, is, which of these two classes of patents, those of the United States or those of the State, transferred the title. The logs were cut in the winter of 1872 and 1873; they were, therefore, standing timber on the land when all the patents were issued, and as such constituted a portion of the realty. Although when severed from the soil the timber became personalty, the title to it remained unaffected. The owner of the land could equally, as before, claim its possession, and pursue it wherever it was carried.

The State asserted title to the land under the compact upon

which she was admitted into the Union. The act of Congress of Aug. 6, 1846, authorizing the people of the Territory of Wisconsin to organize a State government, contained various propositions respecting grants of land to the new State, to be submitted for acceptance or rejection to the convention which was to assemble for the purpose of framing its constitution. Some of the proposed grants were to be for the use of schools, some for the establishment and support of a university, some for the erection of public buildings, and some were to be of lands containing salt springs. They were promised on condition that the convention should provide by a clause in the Constitution, or by an ordinance irrevocable without the consent of the United States, that the State would never interfere with the primary disposal of the soil within it by the United States, nor with any regulations Congress might find necessary for securing the title in such soil to *bona fide* purchasers ; that no tax should be imposed on lands the property of the United States ; and that in no case should non-resident proprietors be taxed higher than residents. And the act provided that if the propositions were accepted by the convention, and ratified by an article in the Constitution, they should be obligatory on the United States. The first of these propositions was " that section numbered sixteen (16) in every township of the public lands in said State, and where such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said State for the use of schools."

The convention which subsequently assembled accepted the propositions, and ratified them by an article in the Constitution, embodying therein the provisions required by the act of Congress as a condition of the grants. With that Constitution the State was admitted into the Union in May, 1848. 9 Stat. 233. It was, therefore, an unalterable condition of the admission, obligatory upon the United States, that section sixteen (16) in every township of the public lands in the State, which had not been sold or otherwise disposed of, should be granted to the State for the use of schools. It matters not whether the words of the compact be considered as merely promissory on the part of the United States, and constituting only a pledge of a grant

in future, or as operating to transfer the title to the State upon her acceptance of the propositions as soon as the sections could be afterwards identified by the public surveys. In either case, the lands which might be embraced within those sections were appropriated to the State. They were withdrawn from any other disposition, and set apart from the public domain, so that no subsequent law authorizing a sale of it could be construed to embrace them, although they were not specially excepted. All that afterwards remained for the United States to do with respect to them, and all that could be legally done under the compact, was to identify the sections by appropriate surveys; or, if any further assurance of title was required, to provide for the execution of proper instruments to transfer the naked fee, or to adopt such further legislation as would accomplish that result. They could not be diverted from their appropriation to the State.

In *Cooper* v. *Roberts*, 18 How. 173, this court gave construction to a similar clause in the compact upon which the State of Michigan was admitted into the Union, and held, after full consideration, that by it the State acquired such an interest in every section 16 that her title became perfect so soon as the section in any township was designated by the survey. "We agree," said the court, "that, until the survey of the township and the designation of the specific section, the right of the State rests in compact, — binding, it is true, the public faith, and dependent for execution upon the political authorities. Courts of justice have no authority to mark out and define the land which shall be subject to the grant. But, when the political authorities have performed this duty, the compact has an object upon which it can attach, and, if there is no legal impediment, the title of the State becomes a legal title. The *jus ad rem*, by the performance of that executive act, becomes a *jus in re*, judicial in its nature, and under the cognizance and protection of the judicial authorities, as well as the others." In this case, the township embracing the land in question was surveyed in October, 1852, and was subdivided into sections in May and June, 1854. With this identification of the section the title of the State, upon the authority cited, became complete, unless there had been a sale or other disposition of the property by the

United States previous to the compact with the State. No subsequent sale or other disposition, as already stated, could defeat the appropriation. The plaintiff contends that there had been a prior reservation of the land to the use of the Menomonee tribe of Indians.

It is true that, for many years before Wisconsin became a State, that tribe occupied various portions of her territory, and roamed over nearly the whole of it. In 1825, the United States undertook to settle by treaty the boundaries of lands claimed by different tribes of Indians, as between themselves, and agreed to recognize the boundaries thus established, the tribes acknowledging the general controlling power of the United States, and disclaiming all dependence upon and connection with any other power. The land thus recognized as belonging to the Menomonee tribe embraced the section in controversy in this case. Subsequently, in 1831, the same boundaries were again recognized. But the right which the Indians held was only that of occupancy. The fee was in the United States, subject to that right, and could be transferred by them whenever they chose. The grantee, it is true, would take only the naked fee, and could not disturb the occupancy of the Indians: that occupancy could only be interfered with or determined by the United States. It is to be presumed that in this matter the United States would be governed by such considerations of justice as would control a Christian people in their treatment of an ignorant and dependent race. Be that as it may, the propriety or justice of their action towards the Indians with respect to their lands is a question of governmental policy, and is not a matter open to discussion in a controversy between third parties, neither of whom derives title from the Indians. The right of the United States to dispose of the fee of lands occupied by them has always been recognized by this court from the foundation of the government. It was so ruled in *Johnson* v. *McIntosh*, 8 Wheat. 543, in 1823; and in *United States* v. *Cook*, 19 Wall. 591, in 1873. Other cases between those periods have affirmed the same doctrine. *Clark* v. *Smith*, 13 Pet. 195. See also *Jackson* v. *Hudson*, 3 Johns. (N. Y.) 375; *Veeder et al.* v. *Guppy*, 3 Wis. 502; and 8 Opin. Atty.-Gen., pp. 262–264. In *United States* v. *Cook*, the United

States maintained replevin for timber cut and sold by Indians on land reserved to them, the court observing that the fee was in the United States, and only a right of occupancy in the Indians; that this was the title by which other Indians held their land, and that the authority of *Johnson* v. *McIntosh* on this point had never been doubted. But, added the court, " the right of the Indians to their occupancy is as sacred as that of the United States to the fee, but it is only a right of occupancy. The possession, when abandoned by the Indians, attaches itself to the fee without further grant."

In the construction of grants supposed to embrace lands in the occupation of Indians, questions have arisen whether Congress intended to transfer the fee, or otherwise; but the power of the United States to make such transfer has in no instance been denied. In the present case, there can hardly be a doubt that Congress intended to vest in the State the fee to section 16 in every township, subject, it is true, as in all other cases of grants of public lands, to the existing occupancy of the Indians so long as that occupancy should continue. The greater part of the State was, at the date of the compact, occupied by different tribes, and the grant of sections in other portions would have been comparatively of little value. Congress undoubtedly expected that at no distant day the State would be settled by white people, and the semi-barbarous condition of the Indian tribes would give place to the higher civilization of our race; and it contemplated by its benefactions to carry out in that State, as in other States, "its ancient and honored policy" of devoting the central section in every township for the education of the people. Accordingly, soon after the admission of the State into the Union, means were taken for the extinguishment of the Indian title. In less than eight months afterwards the principal tribe, the Menomonees, by treaty, ceded to the United States all their lands in Wisconsin, though permitted to remain on them for the period of two years, and until the President should give notice that they were wanted. 9 Stat. 952.

It is true that subsequently, the Indians being unwilling to leave the State, the President permitted their temporary occupation of lands upon Wolf and Oconto Rivers, and in 1853 the

State gave its assent to the occupation; and in May, 1854, the United States, by treaty, ceded to them certain lands for a permanent home, the treaty taking effect upon its ratification in August of that year; and afterwards a portion of these lands was, by another treaty, ceded to the Stockbridge and Munsee tribes. But when the logs in suit were cut, those tribes had removed from the land in controversy, and other sections had been set apart for their occupation.

The act of Congress of Feb. 6, 1871, authorizing a sale of the townships occupied by the Stockbridge and Munsee tribes, must, therefore, be held to apply only to those portions which were outside of sections 16. It will not be supposed that Congress intended to authorize a sale of land which it had previously disposed of. The appropriation of the sections to the State, as already stated, set them apart from the mass of public property which could be subjected to sale by its direction.

It follows that the plaintiff acquired no title by his patents to the land in question, and, of course, no property in the timber cut from it.                                    *Judgment affirmed.*