MORRISON et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. February 2, 1914.)

No. 2295.

PUBLIC LANDS (§ 51*)—GRANT TO STATE OF SCHOOL LANDS—SUBSEQUENT INCLUSION IN FOREST RESERVATION.

Act Aug. 14, 1848, c. 177, 9 Stat. 323, establishing a territorial government for Oregon, provided that "when the lands in the said territory shall be surveyed * * * sections numbered 16 and 36 in each township * * * shall be and the same is hereby reserved for the purpose of being applied to schools in said territory and in the states and territories hereafter to be erected out of the same." Subsequent acts relating to dona-

tions and surveys recognized such reservation, and authorized the Governor and legislative assembly of the territory to make laws for the regulation and protection of the lands so granted. Oregon Enabling Act Feb. 14, 1859, c. 33, 11 Stat. 383, under which the state was admitted, submitted to the 'people certain propositions "which if accepted shall be obligatory on the United States and upon the said state of Oregon, to wit: First that sections numbered 16 and 36 in every township of public lands in said state * * * shall be granted to said state for the use of schools." A certain township was surveyed in 1902, and the survey was approved by the Surveyor General for Oregon, and forwarded to the Commissioner of the General Land Office, by whom it was accepted in 1906. In 1905 the Secretary of the Interior made an order, temporarily withdrawing for forestry purposes "all the vacant and unappropriated public lands" within certain described boundaries, which included section 16 in said township, and in 1910 the President by proclamation enlarged the boundaries of a forest reserve to include said section within its boundaries, but excepted therefrom all lands which at the date of the proclamation were embraced within any withdrawal or reservation for any inconsistent use or purpose. Prior to this time, but after the approval of the survey, the state had sold and conveyed the land in suit, which was a part of said section 16, as school land to defendants. *Held,* that the legislation of Congress, accepted by the people of Oregon, amounted to a grant of sections 16 and 36 in each township, which became effective as to each section as soon as it was identified by an approved survey; the approval dating back by relation to the inception of the proceeding, that such grant could not be defeated by any subsequent withdrawal or other appropriation, and that the land in suit was within the exceptions in the withdrawal order and President's proclamation.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 138, 146; Dec. Dig. § 51.*]

Gilbert, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Oregon; Chas. E. Wolverton, Judge.

Suit in equity by the United States against W. J. Morrison, Finley Morrison, and the Sligh Furniture Company. Decree for the United States, and defendants appeal. Reversed.

Mark Norris, of Grand Rapids, Mich., and R. Sleight, of Portland, Or., for appellants.

Clarence L. Reames, U. S. Atty., and Everett A. Johnson, Asst. U. S. Atty., both of Portland, Or.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The sole question in this case is whether the lands here in controversy, which constitute a part of section 16, township 3 south, range 6 east of the Willamette meridian, in the state of Oregon, passed to that state, and through it to its grantees, prior to the attempted withdrawal of the said lands from any disposition by the executive department of the government.

The act of Congress of August 14, 1848 (9 Stat. 323, c. 177,), entitled "An act to establish the territorial government of Oregon," provided in its twentieth section:

"That when the lands in the said territory shall be surveyed under the direction of the government of the United States, preparatory to bringing the same into market, sections numbered sixteen and thirty-six in each township

---

in said territory shall be, and the same is hereby, reserved for the purpose of being applied to schools in said territory, and in the states and territories hereafter to be erected out of the same."

In the act of Congress of September 27, 1850 (9 Stat. 496, c. 76), entitled "An act to create the office of Surveyor General of the Public Lands in Oregon, and to provide for the survey, and to make donations to settlers of the said public lands," it was provided, among other things:

"Sec. 3. That if, in the opinion of the Secretary of the Interior, it be preferable, the surveys in said territory shall be made after what is known as the goedetic method, under such regulations, and upon such terms, as may be provided by the Secretary of the Interior or other department having charge of the surveys of the public lands, and that said goedetic surveys shall be followed by topographical surveys, as Congress may from time to time authorize and direct; but if the present mode of survey be adhered to, then it shall be the duty of said surveyor to cause a base line and meridian to be surveyed, marked, and established, in the usual manner, at or near the mouth of the Willamette river; and he shall also cause to be surveyed, in townships and sections, in the usual manner, and in accordance with the laws of the United States, which may be in force, the district of country lying between the summit of the Cascade Mountains and the Pacific Ocean, and south and north of the Columbia river: Provided, however, that none other than township lines shall be run where the land is deemed unfit for cultivation. That no deputy surveyor shall charge for any line except such as may be actually run and marked, nor for any line not necessary to be run; and that the whole cost of surveying shall not exceed the rate of eight dollars per mile, for every mile and part of mile actually surveyed and marked"

—and after making certain donations of public lands to certain specifically described settlers, declared, in its ninth section, as follows:

"That no claim to a donation right under the provisions of this act, upon sections sixteen or thirty-six, shall be valid or allowed, if the residence and cultivation upon which the same is founded shall have commenced after the survey of the same; nor shall such claim attach to any tract or parcel of land selected for a military post, or within one mile thereof, or to any other land reserved for governmental purposes, unless the residence and cultivation thereof shall have commenced previous to the selection or reservation of the same for such purposes."

By its act of February 19, 1851 (9 Stat. 568, c. 10), entitled "An act to authorize the legislative assemblies of the territories of Oregon and Minnesota to take charge of the school lands in said territories, and for other purposes," Congress enacted:

"That the Governors and legislative assemblies of the territories of Oregon and Minnesota be, and they are hereby, authorized to make such laws and needful regulations as they shall deem most expedient to protect from injury and waste sections numbered sixteen and thirty-six in said territories, reserved in each township for the support of schools therein."

By its act of February 14, 1859 (11 Stat. 383, c. 33), entitled "An act for the admission of Oregon into the Union," Congress provided, among other things, as follows:

"Sec. 4. That the following propositions be, and the same are hereby, offered, to the said people of Oregon for their free acceptance or rejection, which, if accepted, shall be obligatory on the United States and upon the said state of Oregon, to wit: First, that sections numbered sixteen and thirty-six in every township of public lands in said state, and where either of said sections, or any part thereof, has been sold or otherwise been disposed of, other lands

equivalent thereto, and as contiguous as may be, shall be granted to said state for the use of schools. Second, that seventy-two sections of land shall be set apart and reserved for the use and support of a state university, to be selected by the Governor of said state, subject to the approval of the Commissioner of the General Land Office, and to be appropriated and applied in such manner as the Legislature of said state may prescribe for the purpose aforesaid, but for no other purpose. Third. That ten entire sections of land, to be selected by the Governor of said state, in legal subdivisions, shall be granted to said state for the purpose of completing the public buildings, or for the erection of others at the seat of government, under the direction of the Legislature thereof. Fourth. That all salt springs within said state, not exceeding twelve in number, with six sections of land adjoining, or as contiguous as may be to each, shall be granted to said state for its use, the same to be selected by the Governor thereof within one year after the admission of said state, and when so selected, to be used or disposed of on such terms, conditions and regulations as the Legislature shall direct: Provided, that no salt spring or land, the right whereof is now vested in any individual or individuals, or which may be hereafter confirmed or adjudged to any individual or individuals, shall by this article be granted to said state. Fifth. That five per centum of the net proceeds of sales of all public lands lying within said state which shall be sold by Congress after the admission of said state into the Union, after deducting all the expenses incident to the same, shall be paid to said state, for the purpose of making public roads and internal improvements, as the Legislature shall direct: Provided, that the foregoing propositions, hereinbefore offered, are on the condition that the people of Oregon shall provide by an ordinance, irrevocable without the consent of the United States, that said state shall never interfere with the primary disposal of the soil within the same by the United States, or with any regulations Congress may find necessary for securing the title in said soil to bona fide purchasers thereof; and that in no case shall nonresident proprietors be taxed higher than residents. Sixth. And that the said state shall never tax the lands or the property of the United States in said state: Provided, however, that in case any of the lands herein granted to the state of Oregon have heretofore been confirmed to the territory of Oregon for the purposes specified in this act, the amount so confirmed shall be deducted from the quantity specified in this act."

The propositions specifically stated in section 4 of the act of February 14, 1859, as well as the aforesaid acts respecting the school sections, were, according to the stipulation of facts entered into by and between the respective parties to the present case, accepted by an act of the legislative assembly of the state of Oregon of June 3, 1859 (Laws, 1st Extra Sess. p. 36).

The stipulation shows these further facts: Prior to May 27, 1902, the lands in controversy were unsurveyed. On that day a field survey of their east boundary was made, and on June 2d following the north, west, and south boundaries thereof were surveyed, and the said section 16 subdivided according to the rules of the Land Office for surveying the lands of the government. This field survey was approved by the United States Surveyor General for the state of Oregon June 2, 1903, and on the 8th of the same month that officer transmitted copies of the plat of the survey and field notes to the Commissioner of the General Land Office at Washington, which survey was accepted by the Commissioner January 31, 1906. On November 16, 1907, the Commissioner directed the Surveyor General to place a plat of the survey in the field, in the local land office of the United States at Portland, Or., which was on the same day accordingly filed in that office. Shortly prior to the acceptance by the Commissioner of the survey mentioned, to wit, on the 16th day of December, 1905, the Secretary of

the Interior made an order temporarily withdrawing, for forestry purposes, from all forms of disposition whatsoever except under the mineral laws of the United States—

"all the vacant and unappropriated public lands within the areas specifically described in that certain letter of the Commissioner of the General Land Office, of date December 12, 1905, to the Secretary of the Interior, including all of township three (3) south, range six (6) east of the Willamette meridian."

In December, 1905, a telegram was sent by the Commissioner of the General Land Office to the register and receiver of the United States land office at Portland, Or., informing him of said withdrawal, and stating that the land had been withdrawn for forestry purposes, and on December 19, 1905, a letter was sent by the said Commissioner to the register and receiver, giving him the same information. The said withdrawal, so made by the Secretary of the Interior and the Commissioner of the General Land Office, described said lands according to the rectangular system of government survey. October 10, 1906, the state of Oregon, in pursuance of its laws for the disposal of lands owned by it, executed a certificate of sale to one Robert F. Louden for the S. E. ¼ of the said section 16, and to Alvina S. Louden a similar certificate for the S. ½ of the N. E. ¼ and the N. W. ¼ of the N. W. ¼ of the said section, who thereafter assigned the said certificates of sale to the appellants Finley and W. J. Morrison, and on January 9, 1907, the state of Oregon, on the surrender of such certificates, executed to the latter purchasers a deed of grant covering the said described lands. On July 9, 1910, the said Morrisons conveyed the same lands to the appellant Sligh Furniture Company. January 25, 1907, the President of the United States issued a proclamation enlarging the Cascade Range Forest Reserve, the boundaries of which included the said land, which proclamation, however, provided, among other things, that all lands which at the date of the proclamation were embraced within any withdrawal or reservation for any use or purpose to which the reservation for forest uses was inconsistent, were excepted from its force and effect.

It is thus seen that long before Oregon became a state Congress provided that when the lands in the then territory should be surveyed under the direction of the government of the United States preparatory to bringing the same into market, sections numbered 16 and 36 in each township in the territory—

"shall be, and the same hereby is, reserved for the purpose of being applied to schools in said territory, and in the states and territories hereafter to be erected out of the same."

Two years and more later, in passing what is commonly known as the Donation Act, Congress expressly provided that no donation right thereby conferred should affect any sixteenth or thirty-sixth section, if the residence and cultivation upon which such donation right is founded "shall have commenced after the survey" of such sixteenth and thirty-sixth sections; and by a subsequent act of January 7, 1853 (10 Stat. 150, c. 6), it gave to the territory of Oregon the right to take other lands in lieu of such of the sixteenth and thirty-sixth sections as should be acquired by third parties under the Donation Act.

By its Act of February 19, 1851, respecting the territories of Oregon and Minnesota, Congress expressly authorized the Governors and legislative assemblies of those territories—

"to make such laws and needful regulations as they shall deem most expedient to protect from injury and waste sections sixteen and thirty-six in said territories, reserved in each township for the support of schools therein."

And finally, by the Enabling Act of February 14, 1859, Congress expressly declared, among other things, that the propositions thereby offered to the people of Oregon for their acceptance or rejection, "if accepted shall be obligatory upon the United States, and upon the state of Oregon." Those propositions were, we repeat:

"First, that sections numbered sixteen and thirty-six in every township of public lands in said state, and where either of said sections, or any part thereof, has been sold or otherwise been disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said state for the use of schools. Second. That seventy-two sections of land shall be set apart and reserved for the use and support of a state university, to be selected by the Governor of said state, subject to the approval of the Commissioner of the General Land Office, and to be appropriated and applied in such manner as the Legislature of said state 'may prescribe for the purpose aforesaid, but for no other purpose. Third. That ten entire sections of land, to be selected by the Governor of said state, in legal subdivisions, shall be granted to said state for the purpose of completing the public buildings, or for the erection of others at the seat of government, under the direction of the Legislature thereof. Fourth. That all salt springs within said state, not exceeding twelve in number, with six sections of land adjoining, or as contiguous as may be to each, shall be granted to said state for its use, the same to be selected by the Governor thereof within one year after the admission of said state, and when so selected, to be used or disposed of on such terms, conditions, and regulations as the Legislature shall direct: Provided, that no salt spring or land, the right whereof is now vested in any individual or individuals, or which may be hereafter confirmed or adjudged to any individual or individuals, shall by this article be granted to said state. Fifth. That five per centum of the net proceeds of sales of all public lands lying within said state which shall be sold by Congress after the admission of said state into the Union, after deducting all the expenses incident to the same, shall be paid to said state, for the purpose of making public roads and internal improvements, as the Legislature shall direct: Provided, that the foregoing propositions, hereinbefore offered, are on the condition that the people of Oregon shall provide by an ordinance, irrevocable without the consent of the United States, that said state shall never interfere with the primary disposal of the soil within the same by the United States, or with any regulations Congress may find necessary for securing the title in said soil to bona fide purchasers thereof; and that in no case shall nonresident proprietors be taxed higher than residents. Sixth. And that the said state shall never tax the lands or the property of the United States in said state: Provided, however, that in case any of the lands herein granted to the state of Oregon have heretofore been confirmed to the territory of Oregon for the purposes specified in this act, the amount so confirmed shall be deducted from the quantity specified in this act."

The propositions so submitted to the people of Oregon having been accepted by them, it cannot be doubted, we think, that the legislation of Congress amounted to a congressional grant to that state of all the sixteenth and thirty-sixth sections for school purposes, to which no right of any third party attached prior to the proper identification of such sections.

Such identification of the lands here in controversy was first made by the survey in the field June 2, 1902, which survey, it appears, was

approved on the same day by the United States Surveyor General for the State of Oregon, and by him transmitted to the General Land Office on the 8th of the same month, where it remained unaltered until its express approval by that office on the 31st day of January, 1906, and where in the meantime it met with recognition and was acted upon to identify the lands in question by the Commissioner of the General Land Office on the 12th and 19th days of December, 1905, and by the Secretary of the Interior on the 16th day of December, 1905, in making his order of withdrawal relied upon by the government in the present case. The fact that there was a delay of about 3½ years in the *express* approval of the survey by the Commissioner of the General Land Office is, in our opinion, wholly unimportant, and by no means unusual. The approval, when made, under the familiar doctrine of relation adopted by the courts for purposes of justice, related back to the inception of the proceeding, thereby perfecting the grant which was promised by the government when Oregon was a territory, and confirmed when it, as a state, accepted the propositions offered by Congress in its Enabling Act of 1859. It was, as said by the Supreme Court in a similar case—

"an unalterable condition of the admission, obligatory upon the United States, that section 16 in every township of the public lands in the state, which had not been sold or otherwise disposed of, should be granted to the state for the use of schools. It matters not whether the words of the compact be considered as merely promissory on the part of the United States, and constituting only a pledge of a grant in future, or as operating to transfer the title to the state upon her acceptance of the propositions as soon as the sections could be afterwards identified by the public surveys. In either case, the lands which might be embraced within those sections were appropriated to the state. They were withdrawn from any other disposition, and set apart from the public domain, so that no subsequent law authorizing a sale of it could be construed to embrace them, although they were not specially excepted. All that afterwards remained for the United States to do with respect to them, and all that could be legally done under the compact, was to identify the sections by appropriate surveys; or, if any further assurance of title was required, to provide for the execution of proper instruments to transfer the naked fee, or to adopt such further legislation as would accomplish that result. They could not be diverted from their appropriation to the state." Beecher v. Wetherby, 95 U. S. 517, 24 L. Ed. 440.

In the case cited the court proceeded:

"In Cooper v. Roberts, 18 How. 173 [15 L. Ed. 338], this court gave construction to a similar clause in the compact upon which the state of Michigan was admitted into the Union, and held, after full consideration, that by it the state acquired such an interest in every section 16 that her title became perfect so soon as the section in any township was designated by the survey. 'We agree,' said the court, 'that, until the survey of the township and the designation of the specific section, the right of the state rests in compact, binding, it is true, the public faith, and dependent for execution upon the political authorities. Courts of justice have no authority to mark out and define the land which shall be subject to the grant. But, when the political authorities have performed this duty, the compact has an object upon which it can attach, and, if there is no legal impediment, the title of the state becomes a legal title. The jus ad rem, by the performance of that executive act, becomes a jus in re, judicial in its nature, and under the cognizance and protection of the judicial authorities, as well as the others.' In this case, the township embracing the land in question was surveyed in October, 1852, and was subdivided into sections in May and June, 1854. With this identification of the section the title of the state, upon the authority cited, became complete, un-

less there had been a sale or other disposition of the property by the United States previous to the compact with the state. No subsequent sale or other disposition, as already stated, could defeat the appropriation."

We see nothing in the cases of Minnesota v. Hitchcock, 185 U. S. 373, 22 Sup. Ct. 650, 46 L. Ed. 954, or Wisconsin v. Hitchcock, 201 U. S. 202, 26 Sup. Ct. 498, 50 L. Ed. 727, as applied to the facts in the present case, at all inconsistent with what was said in Beecher v. Wetherby, 95 U. S. 517, 24 L. Ed. 440, or in Cooper v. Roberts, 18 How. 173, 15 L. Ed. 338.

In Minnesota v. Hitchcock it appeared that the sixteenth and thirty-sixth sections were not surveyed until after the rights of the Indians had attached thereto, and that therefore the lands there in question were not "public lands" at the time of the grant contained in the act admitting the state. The court in its opinion in Minnesota v. Hitchcock expressly referred to and quoted from the case of Beecher v. Wetherby, as also its previous decisions in the cases of United States v. Thomas, 151 U. S. 577, 14 Sup. Ct. 426, 38 L. Ed. 276, and Cooper v. Roberts, 18 How. 173, 15 L. Ed. 338, and, so far from disapproving of them, pointed out the distinctions existing between them and the case then under consideration.

The case of Wisconsin v. Hitchcock, supra, was expressly based upon the Thomas Case, which in turn referred to the case of Beecher v. Wetherby with approval.

It hardly need be said that, the lands here in controversy being embraced by the grant to the state of Oregon, the withdrawal order made by the Secretary of the Interior on December 16, 1905, which in express terms excluded therefrom all lands previously appropriated, could not defeat or in any way affect such grant. Tubbs v. Wilhoit, 138 U. S. 134, 11 Sup. Ct. 279, 34 L. Ed. 887. And, as has been seen, the proclamation of the President of date January 25, 1907, also expressly excepts from its operation any inconsistent rights.

For the reasons stated, the judgment is reversed, and the cause remanded to the court below, with directions to dismiss the bill.

GILBERT, Circuit Judge (dissenting). The opinion of the majority of this court is based upon what was said, rather than what was decided, in Beecher v. Wetherby, 95 U. S. 517, 24 L. Ed. 440. There was under consideration in that case the act for the admission of the state of Wisconsin, of date August 6, 1846 (9 Stat. 58, c. 89, § 6), which provided—

"that section numbered 16 in every township of the public lands in said state, and where such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said state for the use of schools."

The section 16 which was in controversy in that case had been included in lands occupied by the Menomonee Indians, which they had held under treaty since 1825. In 1848 they ceded certain of their lands, and there was set apart to them by the President a portion thereof, which included the land in controversy. The Legislature of Wisconsin by a joint resolution of February 1, 1853 (Laws 1853, p. 110) declared its assent that the Indians remain on the tract so set apart to them.

Under the act of Congress of February 6, 1871 (16 Stat. 404, c. 38) the lands so set apart were directed to be sold for the benefit of the Indians, and upon such sale the plaintiff obtained patents to section 16. In the meantime, in 1854, the lands had been surveyed. The court held the plaintiff's patents void, and ruled that the grant to the state had attached upon the identification of the land by the survey of 1854, subject only to the Indian's right of occupancy; that when that was extinguished the title of the state was complete. In Minnesota v. Hitchcock, 185 U. S. 373, 22 Sup. Ct. 650, 46 L. Ed. 954, the court thus stated the purport of the decision in Beecher v. Wetherby:

"The ruling was that the United States held the fee, subject only to the Indian right of occupancy; that by the school land section in the Enabling Act there was a grant, or promise to grant, in either event to be taken as an appropriation of the fee to the state, subject to the Indian right of occupancy; that the Indians had removed from the lands and had received other lands for their occupation; and hence all Indian rights had ceased."

The essential difference between Beecher v. Wetherby and the case at bar is that in the latter there had been no survey or identification of the lands at the time when they were set apart for a reservation, and I submit that the decision of the present case is controlled by the principle stated in Heydenfeldt v. Daney Gold, etc., Co., 93 U. S. 634, 23 L. Ed. 995. In that case the provision of the Enabling Act for the admission of Nevada of March 21, 1864 (13 Stat. 30, c. 36), as to school lands, declared that they "shall be, and are, hereby granted." The lands had not then been surveyed, nor had Congress then authorized any disposition of the public lands within that territory. It was held, notwithstanding that there were words of present grant in the act, the intention was to grant such school lands as at the time of survey and identification had not been disposed of. The court said:

"Until the status of the lands was fixed by a survey, and they were capable of identification, Congress reserved absolute power over them."

And again:

"It is quite certain that the language of the qualification was intended to protect the state against a loss that might happen through the action of Congress in selling or disposing of the public domain."

It is contended that the decision in that case was based upon the fact that the territory of Nevada was a mining country, that Congress must have intended that the mineral land should remain subject to discovery, entry, and exploitation, and that those features distinguish the Nevada act from all others. But that decision has been recognized, both by the Supreme Court and by the Land Department, as settling general principles applicable to other school land grants. It is true that the case was not mentioned or discussed in the opinion in Beecher v. Wetherby, but it was cited in the brief of counsel, and it is in entire harmony with what was actually decided in that case. In New York Indians v. United States, 170 U. S. 1, 18, 18 Sup. Ct. 531, 534 (42 L. Ed. 927), the court cited the Heydenfeldt Case, and, after quoting the language of the grant to Nevada said:

"These words were held, under the peculiar language of the act, not to constitute a grant in præsenti, but an inchoate and incomplete grant until the

premises were surveyed by the United States, and the survey properly approved."

In Minnesota v. Hitchcock the court said:

"As in Heydenfeldt v. Daney Gold & Silver Mining Co., supra, priority was given to a mining entry over the state's school right, so here, in terms, preference is given to private entries, town-site entries, or reservations for public uses. In other words, the act of admission with its clause in respect to school lands was not a promise by Congress that under all circumstances, either then or in the future, these specific school sections were or should become the property of the state. The possibility of other disposition was contemplated, the right of Congress to make it was recognized, and provision made for a selection of other lands in lieu thereof. In this connection may also be noticed the act of February 28, 1891 (26 Stat. 796, c. 384 [U. S. Comp. St. 1901, p. 1381]), although passed after the approval of the agreement for the cession of these lands by the Indians. That act in terms authorized the selection of other lands 'where sections sixteen or thirty-six are mineral land, or are included within any Indian, military, or other reservation, or are otherwise disposed of by the United States."

The grant to Minnesota which was construed in that case is identical in language with the grant to the state of Oregon, and the construction which the court placed upon it is, it seems to me, absolutely conclusive of the question which is presented on this appeal.

The general intention and policy of congressional grants of school lands to the states, and the construction which Congress placed upon its grants, is shown in its legislation on the same subject subsequent to the grant to the state of Oregon, legislation which clearly indicates that Congress did not consider that by virtue of those grants it had wholly parted with title and control of the school lands. Twelve days after the date of the grant to Oregon, Congress enacted:

"That where settlements, with a view to pre-emption, have been made before the survey of the lands in the field which shall be found to have been made on sections sixteen or thirty-six, said sections shall be subject to the pre-emption claim of such settler; and if they, or either of them, shall have been or shall be reserved or pledged for the use of schools or colleges in the state or territory in which the lands lie, other lands of like quantity are hereby appropriated in lieu of such as may be patented by pre-emptors." Act Feb. 26, 1859, c. 58, 11 Stat. 385.

This act was subsequently embodied in section 2275 of the Revised Statutes, and by the act of February 28, 1891 (26 Stat. 796, c. 384 [U. S. Comp. St. 1901, p. 1381]), it was amended by inserting the following:

"And other lands of equal acreage are also hereby appropriated and granted, and may be selected by said state or territory where sections 16 or 36 are mineral land, or are included within any Indian, military, or other reservation, or are otherwise disposed of by the United States," etc.

The decisions of the Secretary of the Interior relating to public lands have uniformly followed the rule of the Heydenfeldt Case. In State of Colorado, 6 Land Dec. Dept. Int. 412, Secretary Lamar, referring to the act of February 28, 1861 (12 Stat. 172, c. 59), which provided a temporary government for the territory of Colorado, "that when the land in the said territory shall be surveyed, under the direction of the government of the United States, preparatory to bringing the same into market, sections numbered sixteen and thirty-six in each township in said territory shall be and the same are hereby reserved for the purpose

of being applied to schools in the states hereafter to be erected out of the same," said:

"It is evident from the very terms of the grant that Congress intended to grant to Colorado (and the same is true of other states) two sections for every township in the state, to be taken of the sixteenth and thirty-sixth sections, where such sections at the time of survey have not been sold or otherwise disposed of; and, where at the time of survey such sections have been sold or disposed of, then other lands equivalent thereto, and as contiguous as may be, are granted to said state in lieu of the sixteenth and thirty-sixth sections."

In Gregg v. State of Colorado, 15 L. D. 151, Secretary Nobel said of the Heydenfeldt Case:

"The principle, distinctly announced by the court, is that until the status of the land is actually fixed by survey, as shown by the township plat, so that the grant may attach to the specific section, the government has the absolute power to dispose of it as a part of the public domain, and to provide for its disposal in any manner that may promote the public interest."

In State of Oregon, 41 Land Dec. Dept. Int. 259, concerning section 2275 of the Revised Statutes, as amended by the act of February 28, 1891, it was said:

"It is clear from this section that title does not pass to the state until survey, nor to reserved lands until the reservation is vacated and the land restored to the public domain. Until such event the right of the state is merely expectant, or inchoate, and though it may stand upon such expectant right and await release of the land from reservation and its restoration to the public domain, it has no title it can convey or right it can assign."

In Boise National Forest, 38 Land Dec. Dept. Int. 224, construing the act of July 3, 1890 (26 Stat. 215, c. 656), providing for the admission of Idaho into the Union, "that sections numbered sixteen and thirty-six in every township of said state, and where such sections, or any parts thereof, have been sold or otherwise disposed of by or under the authority of any act of Congress, other lands equivalent thereto, in legal subdivisions of not less than one-quarter section, and as contiguous as may be to the section in lieu of which the same is taken, are hereby granted to said state for the support of common schools," it was held that the withdrawal of certain lands upon the application of the Governor of Idaho for a survey of the lands under the act of August 18, 1894, did not operate to remove them from the jurisdiction of the United States by reason of the provision contained in the President's proclamation, excepting from the effect thereof all lands which might have been, prior to the date of the proclamation, embraced in any legal entry or covered by any lawful filing duly of record. In State of Florida, 38 Land Dec. Dept. Int. 350, it was said:

"This department and the courts have uniformly held that the grant of school sections in place does not attach to any particular tract of land until the same is identified by survey. See Heydenfeldt v. Daney Gold &. Silver Mining Co., 93 U. S. 634 [23 L. Ed. 995]; Minnesota v. Hitchcock, 185 U. S. 373 [22 Sup. Ct. 650, 46 L. Ed. 954]."

Under the acts for the admission of the states of North Dakota, South Dakota, Montana, and Washington, the policy of congressional legislation in regard to the granting of school lands to the states was still more clearly expressed in a proviso—

"that the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants nor to the indemnity provisions of this act, nor shall any lands embraced in the Indian, military, or other reservations of any character be subject to the grants or to the indemnity provisions of this act until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain." Act Feb. 22, 1889, c. 180, 25 Stat. 679.

I submit that the decree should be affirmed.