## JOHNSTON v. MORRIS.

### (Circuit Court of Appeals, Ninth Circuit. February 3, 1896.)

### No. 257.

1. PUBLIC LANDS—FORFEITED RAILROAD GRANTS.
    Under the act of September 29, 1890 (26 Stat. 496), forfeiting and restoring to the United States the title to all lands theretofore granted to any state or corporation to aid in the construction of a railroad, and opposite which the railroad had not been completed within the time limited, the lands forfeited were restored to the public domain in precisely the same condition as before they were granted, and became subject to disposition under the general land laws.

2. SAME.
    Quære, whether the provision in section 6 of said act that the forfeited lands shall not "inure to the benefit of any state or corporation to which lands may have been granted by congress, except as herein otherwise provided," merely prevents a claim of indemnity by a state or a railroad corporation from attaching to the forfeited lands, for lands lost in place opposite to a completed portion of a railroad; or whether it would prevent a state which has received a grant of school lands from selecting out of the forfeited lands indemnity school lands.

3. SAME—SCHOOL LANDS—INDEMNITY SELECTIONS.
    The act of February 28, 1891 (26 Stat. 796), amending Rev. St. § 2275, and granting to any state or territory whose school sections, or parts thereof, are mineral lands, other lands of equal acreage, was intended

to provide a uniform rule for the selection of indemnity school lands, and is applicable to all states and territories having grants of school lands. Hence the state of California is entitled to make indemnity selections in place of lands lost from its school sections by reason of being mineral lands.

4. SAME—DETERMINATION OF WHAT ARE MINERAL LANDS.

When school lands surveyed by a United States deputy surveyor are certified by him to be mineral, and his field notes and plats are approved by the surveyor general and the commissioner of the general land office, and filed in the land office, this is a sufficient determination that the lands are mineral in character to give the state a right to select other lands as indemnity for the loss.

In Error to the Circuit Court of the United States for the Northern District of California.

This was an action by Henry C. Morris against A. G. Johnston to recover possession of certain lands to which plaintiff claimed title under the state of California, which had selected them as indemnity school lands. The trial below resulted in a judgment for plaintiff, and defendant thereupon sued out this writ of error.

Mullany, Grant & Cushing, for plaintiff in error.

E. P. Morgan (C. A. Keigwin, of counsel), for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and MORROW, District Judge.

MORROW, District Judge. By the act of congress approved July 27, 1866 (14 Stat. 292), certain odd-numbered sections of land were granted to the Atlantic & Pacific Railroad Company, to aid in the construction of a railroad and telegraph line from the states of Missouri and Arkansas to the Pacific coast. Section 18 of this act authorized the Southern Pacific Railroad Company to connect with the Atlantic & Pacific Railroad at such point near the boundary of California as should be deemed most suitable for a railroad line to San Francisco; and, to aid in the construction of such railroad, it was provided that the Southern Pacific Railroad Company should receive grants of land, similar to those granted to the Atlantic & Pacific Railroad Company. The grant of land, so far as it is material to this case, was every alternate section of public land not mineral, designated by odd numbers, to the amount of 10 alternate sections of land per mile on each side of the railroad whenever it passed through any state. The road was required to be completed by July 4, 1878. At that date the only part of the road constructed by the Southern Pacific Railroad Company was from San José southward to Tres Pinos, and from Huron, in the San Joaquin valley, to Goshen, and southwardly to Mojave. That portion of the line of road between Tres Pinos and Huron, in California, a distance of about 100 miles, was not built as required by the act. The act of congress approved September 29, 1890 (26 Stat. 496), forfeited and restored to the United States the title to all lands theretofore granted to any state or corporation to aid in the construction of a railroad opposite to and coterminous with the portion of any such railroad not then completed and in operation; and such lands were declared to be a part of the public domain. The line of road between Tres Pinos and Huron had

not been built when this act was passed.    Section 33, township 13 S., range 9 E., Mt. Diablo Base and Meridian, is located within the limits of the grant to the Southern Pacific Railroad Company, opposite to and coterminous with the line of the uncompleted road between Tres Pinos and Huron, and was therefore one of the forfeited sections restored to the public domain by the act of September 29, 1890.

On the 23d of July, 1892, Joaquin Vinagre made application to the surveyor general of the state of California to purchase a portion of section 33, above described, as school lands; whereupon the surveyor general filed an application with the register of the land office of the United States at San Francisco to select said land as a portion of the school lands granted to California in lieu of an alleged deficiency of school lands in certain sixteenth and thirty-sixth sections, that had been classed in the United States surveys, and designated upon the United States plats, as mineral lands.    This selection was accepted and filed for listing by the register of the land office, under the direction of the commissioner of the general land office; and the surveyor general of the state thereupon issued and delivered to Joaquin Vinagre a certificate of purchase for the land.    By assignment and transfer of this certificate of purchase, all the right, title, and interest of Vinagre to the land in question was conveyed to Henry C. Morris, a citizen of the state of New York, who, on the 9th of August, 1894, brought suit in the United States circuit court against A. G. Johnston to recover possession of the land.    In addition to the facts already stated, the complaint alleges that the land purchased by Vinagre was in lieu of school lands lost to the state in section 36, township 3 N., range 15 E., and in section 16, township 17 S., range 31 E.    The defendant, Johnston, in his answer, denies that these school sections, or either of them, were, or that any part of them was, lost to the state, so as to entitle the state to select lands in lieu of said sections, or any part of them; and alleges that prior to the 23d day of July, 1892, the said township No. 3 N., range 15 E., and township No. 17 S., range 31 E., had been surveyed under the authority of the United States; that in pursuance of law, and in accordance with the requirements of the general land office, the United States surveyor made report as to the mineral or nonmineral character of the lands embraced within such surveys, and in which report, as shown by the field notes of such surveys which were returned to the surveyor general's office by the United States surveyor, it was stated that the said school sections hereinbefore mentioned were mineral lands, and, in accordance with said return and report, the United States surveyor general delineated upon the plats of said surveys the said sections as being mineral lands; that said surveys and reports were duly approved by the United States surveyor general and by the commissioner of the general land office, and that since said surveys were made, and said plat so marked and approved as aforesaid, no proceedings whatever have been had to determine the mineral or nonmineral character of said school sections; that the selections made on the 23d day of July, 1892, in lieu of said school sections, were so made upon the assumption that the said school sections were mineral lands, whereas in fact the mineral or nonmineral char-

acter of said lands had not at that date, and never has been, determined or adjudicated. In short, the defendant avers that, by reason of the facts set forth in the answer, the whole proceedings relating to the purchase of the land by Vinagre are null and void, and of no effect. To this answer, the plaintiff interposed a demurrer, on the ground that the matters set up in the answer did not constitute a defense to the action. The demurrer was sustained, and the defendant has brought the case here on a writ of error.

For the reversal of the judgment, the plaintiff in error contends: (1) That the act of September 29, 1890, did not restore the odd-numbered sections thereby forfeited to the United States, to be disposed of under the general land laws of the United States; (2) that, if such forfeited lands are held to be otherwise subject to such disposal, then, by reason of the provisions of section 6 of that act, the forfeiture did not inure to the benefit of the state of California; (3) that the act of February 28, 1891 (26 Stat. 796), amending section 2275 of the Revised Statutes, and granting other lands of equal acreage to any state or territory where sections 16 or 36 are mineral lands, does not apply to the state of California; (4) that the selection, by the state, of the land in question, must fail in any event, since it has not been determined or finally adjudicated by the land department that the school lands in sections 16 and 36, designated as the basis of the selection, are mineral lands.

Taking these questions in their order, we proceed to consider the scope and purpose of the act of September 29, 1890. It is expressly declared in the first section that the forfeited land is to be part of the public domain. Section 2 provides that actual settlers in good faith upon such lands are given a preference to enter the lands under the provisions of the homestead law, and any person who has not before had the benefit of the homestead or pre-emption laws, or who has failed, from any cause, to perfect the title to a tract of land, under either of said laws, may make a second homestead entry under the act. Section 3 provides that certain persons, who are in possession of any of the lands affected by the grant resumed by and restored to the United States, shall, under certain circumstances, and within a certain time, be entitled to purchase the same from the United States, in quantities not exceeding 320 acres to any one purchaser, at the rate of $1.25 per acre. It is very clear, from these provisions, that, instead of these lands being reserved from the operation of the general public land laws of the United States, it was the purpose of congress to restore them to the public domain in precisely the same condition they were in before the granting acts were passed. There can be no reservation of public lands from the general disposition provided for them, except by reason of some treaty, law, or authorized act of the executive department of the government. Wolsey v. Chapman, 101 U. S. 755. No such reservation of these lands having been made, it must be presumed that they were restored to the public domain, to be disposed of as other lands are disposed of by law.

The contention that, by reason of the provisions of section 6 of the act, the forfeiture does not inure to the benefit of the state

of California, is based upon the language of that section, as follows:

"That no lands declared forfeited to the United States by this act shall, by reason of such forfeiture, inure to the benefit of any state or corporation to which lands may have been granted by congress except as herein otherwise provided."

Lands had been granted by congress to the state of California, and, among others, sections 16 and 36 in each township, for school purposes, under section 6 of the act of March 3, 1853 (10 Stat. 246); and it is claimed that the selection made by the state in this case, and which is the basis of the title held by Morris, was under this grant. The contention is that, where a state had received a grant of land from congress for any purpose, it was excluded from taking any part of the lands restored to the public domain by the forfeiture act in satisfaction of its grant. The act of September 29, 1890, relates to the forfeiture of all unearned lands granted for the purpose of aiding in the construction of railroads, whether such grant had originally been made to the state or directly to the corporation. The language of section 6, now under consideration, appears to have been first employed in section 4 of the act of March 2, 1889, entitled "An act to forfeit lands granted to the state of Michigan to aid in the construction of a railroad from Marquette to Ontonagon, in said state" (25 Stat. 1008). In that act this provision has special significance, and was construed by the land department as excluding the claim of a railroad company for an indemnity selection for a completed portion of its road out of a grant to the state for another road that had been forfeited. The claim was that the Ontonagon & Brule Railroad Company had the right to select, as indemnity for land lost in place, other lands opposite to a completed portion of its road, but within the primary limits of a grant to the Marquette, Houghton & Ontonagon Railroad forfeited by the act. The secretary of the interior, referring to the provision "that no lands declared forfeited to the United States by this act shall inure to the benefit of any state or corporation to which lands may have been granted by congress," held that it was a specific provision against such an indemnity selection, "the evident purpose being to forever remove from railroad claim, and restore to the public domain, free and unincumbered, all lands forfeited by said act." Ontonagon & B. R. R. Co., 13 Land Dec. Dep. Int. 476. This interpretation of the provision, as found in the act of March 2, 1889, applied to the same provision in the act of September 29, 1890, would limit its effect to the forfeiture of the right, whether asserted by a state or railroad corporation, to a claim of indemnity within the primary limits of a forfeited grant for lands lost in place opposite to a completed portion of a railroad; and, if this view of the provision is correct, it would follow that it does not apply to the state of California, as no railroad grants were ever made directly to the state by congress, and it would not apply to the selection in this case, because it is not based upon a railroad indemnity claim. But we do not find it necessary to pass upon this point, for, as we shall see presently, the question whether congress

intended to exclude, from the benefits of the forfeiture act, states that had received grants of land under any previous law, becomes immaterial in this case, in view of the conclusion reached that the selection was made under the provisions of the act of February 28, 1891, amending section 2275 of the Revised Statutes (an act passed subsequently to the forfeiture act).

The contention that the act of February 28, 1891 (26 Stat. 796), amending section 2275 of the Revised Statutes, does not apply to California, is supported by a decision of the secretary of the interior, dated July 6, 1892 (State of California, 15 Land Dec. Dep. Int. 10). The secretary had before him an appeal, taken by the state of California, from a decision of the general land office rejecting certain applications by the state to select indemnity school lands upon the basis of townships made fractional by reason of portions thereof being swamp lands. It was contended on the part of the state, among other things, that as the swamp lands situated within the state had been granted to the state by the act of September 28, 1850, those lands had been "otherwise disposed of by the United States," and that the state was therefore entitled to indemnity selection for sections 16 and 36 of such lands lost from the school grant by reason of being swamp lands. This contention was based upon the following provision of section 2275 of the Revised Statutes, as amended by the act of February 28, 1891:

"And other lands of equal acreage are also hereby appropriated and granted, and may be selected by said state or territory where sections sixteen or thirty-six are mineral land, or are included within any Indian, military, or other reservation, or are otherwise disposed of by the United States."

The secretary held that California took her school grant under section 6 of the act of March 3, 1853, and section 6 of the act of July 23, 1866; and that the indemnity provision of section 2275 of the Revised Statutes, as amended, was not applicable to selections made by the state in lieu of the swamp land lost from the school land grant, on the ground that it would be giving to the state an indemnity for a class of lands already donated to the state; and that the principle upon which indemnity is given to the state is for a loss, and not for that which the state has already received. This is a clear and forcible statement of the reason why the state is not entitled to make indemnity selections for school lands which it had already received as swamp lands, but this reason does not apply to losses from the school grant by reason of sections 16 and 36 being mineral lands. Where such sections are found to be mineral lands, there is an absolute loss of such lands to the state, and, to that extent, a clear and unconditional diminution of the school land grant. The policy of congress has been, clearly, in the direction of an enlargement of the grant to the state, rather than a diminution. When, therefore, the secretary went beyond the question he had before him, relating to swamp lands, and determined that section 2275, as amended by the act of February 28, 1891, did not give any additional indemnity rights to the states, and that such provisions merely declared the existing laws, he certainly gave to the amendment a limitation not warranted by the

legitimate conclusion to be drawn from his own argument; and it appears to be too narrow an interpretation to hold that the amendment only provided an additional right in the adjustment of the grant to make indemnity selections in advance of the surveys, and from any unappropriated public lands in the state or territory where the loss occurs, instead of from lands most contiguous to the same. A more satisfactory interpretation of the statute as amended is to be found in a prior decision of the secretary of the interior, dated April 22, 1891, where it was held that it was intended by the act of February 28, 1891, to provide a uniform rule for the selection of indemnity of lands applicable to all the states and territories having grants of school lands. This decision is based, mainly, upon the proceedings in congress, and, particularly, on the report of the committee on public lands of the house of representatives, reciting and adopting a report previously made to the senate. This report contained the following statement:

"In the administration of the law, it has been found by the land department that the statute does not meet a variety of conditions, whereby the states and territories suffer loss of these sections, without adequate provision for indemnity selection in lieu thereof. Special laws have been enacted in a few instances to cover, in part, these defects with respect to particular states or territories; but, as the school grant is intended to have equal operation and equal benefit in all the public land states and territories, it is obvious the general law should meet the situation, and partiality or favor be thereby excluded. * * * The bill as now framed will cure all inequalities in legislation; place the states and territories in a position where the school grant can be applied to good lands, and largest measure of benefit to the school funds be thereby secured." 22 Cong. Rec. p. 3632.

In construing a statute, aid may be derived from attention to the state of things as it appeared to the legislature when the statute was enacted. U. S. v. Union Pac. R. Co., 91 U. S. 72; Platt v. Railroad Co., 99 U. S. 48; Smith v. Townsend, 148 U. S. 490, 13 Sup. Ct. 634.

From the statement of the committee, it appears very clearly that the statute was intended to be general in its terms, and applicable alike to all the states and territories receiving grants of school lands; and such appears to be the view now held by the secretary of the interior, who, under date of September 27, 1895, so interpreted the statute in a decision relating to a settlement before survey on school lands in the state of Nebraska. 21 Land Dec. Dep. Int. 220.

The law being general, and providing indemnity selection for mineral lands in sections 16 and 36 of each township, it follows that California is entitled to make such a selection for the land lost to the state in section 36, township 3 N., range 15 E., and in section 16, township 17 S., range 31 E., providing it is sufficiently established in this case that the land is of a mineral character; and that question we now proceed to consider.

The school sections above described were certified by the United States deputy surveyor to be mineral. His field notes of surveys and plats thereof were approved by the United States surveyor general and the commissioner of the general land office, and filed in the

United States land office. Upon this showing, the state alleged a loss of the said sections for school purposes, and has selected other lands in lieu thereof. The objection to the selection is that such designation and return do not in fact make the sections mineral lands, within the meaning of the law.

Section 2319 of the Revised Statutes provides that:

"All valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase."

The survey of public lands is provided by sections 2395 to 2413 of the Revised Statutes. Section 2406 provides that "the public surveys shall extend over all mineral lands." By paragraph 7 of section 2395, the deputy surveyor is required to note in his field books the true situation of all mines, salt licks, salt springs, and mill seats which may come to his knowledge, and also the quality of the lands. Paragraph 8 of the same section provides that:

"These field books shall be returned to the surveyor general, who shall cause therefrom a description of the whole lands surveyed to be made out and transmitted to the officers who may superintend the sales."

Section 441, Rev. St. U. S., reads:

"The secretary of the interior is charged with the supervision of public business relating to the following subjects: * * * Second. The public lands, including mines."

Section 453, Rev. St. U. S., provides that the commissioner of the general land office shall perform, under the direction of the secretary of the interior, all executive duties pertaining to the survey and sale of the public lands of the United States, or in any wise respecting such public lands, and also such as relate to private claims of land.

In Sutton v. State of Minnesota, 7 Land Dec. Dep. Int. 562, 564, the secretary of the interior said:

"The field notes of survey, being entries in writing made by a public officer in the regular discharge of his duty, are presumptively correct, and are prima facie evidence of the fact stated, of a very high character. They must be taken as true, till disproved by a clear preponderance of the evidence."

In Re John W. Moore, 13 Land Dec. Dep. Int. 64, 66, he held that:

' "The returns of the surveyor general and the record of the survey made under his direction are evidence of the highest character, that no private survey can be allowed to overcome."

In the case of Bishop of Nesqually v. Gibbon, 158 U. S. 155, 15 Sup. Ct. 779, the plaintiff claimed the right to 640 acres of land under the act of August 14, 1848, establishing the territorial government of Oregon, wherein it was provided:

"That the title to the land, not exceeding six hundred and forty acres, now occupied as missionary stations among the Indian tribes in said territories, together with the improvements thereon, be confirmed and established in the several religious societies to which said missionary stations respectively belong."

In the bill filed in the court below, the plaintiff alleged that, under and by virtue of the foregoing provision, it was entitled to a

tract of 640 acres at and adjacent to the present town of Vancouver, 430 acres of which were in the occupancy of the defendants as officers and soldiers of the United States, who held the same as a military reservation. In the previous controversy relating to this tract of land, it appears that the secretary of the interior had sustained the claim of the plaintiff to only a small tract (less than half an acre), upon which the building used as a church was situated, and had denied it as to the rest of the land. Afterwards the president approved a final survey and plat of the military reservation, confirmed the previous action of the war department, and declared the reservation set apart for military purposes. Commenting on these facts, the supreme court said:

"Upon these facts, it may well be doubted whether the decision of the secretary of the interior. is not conclusive. The act of congress purports to confirm 'the title to the land, not exceeding six hundred and forty acres, now occupied as missionary stations.' It is a question of fact whether there was at Vancouver a missionary station, and also a like question, if one existed, how much land it occupied. The rule is that, in the administration of the public lands, the decision of the land department upon questions of fact is conclusive, and only questions of law are reviewable in the courts."

It was held further:

"While there may be no specific reference in the act of 1848 of questions arising under this grant to the land department, yet its administration comes within the scope of the general powers vested in that department."

It is not claimed in this case by the defendant in error that the classification of public lands as mineral lands by the surveyor is absolutely conclusive upon the land department as to their real character, but that, when lands are surveyed and returned by the surveyor as mineral lands, they are treated and dealt with by the land department as such as long as they are so classified. The question is, what is the status of a school section when the state comes to make a selection? If it is mineral land, it is free and open to exploration and purchase under the laws of the United States; and, if it is so classified by the land department, it cannot be taken by the state, but other lands may be selected as indemnity for the loss. In this way, there is provided an immediate adjustment of the claim of the state under the school land grant. This method of procedure appears to be fair and reasonable, and in accordance with the purpose of the law. The state was therefore entitled to make a selection in lieu of such mineral lands.

The judgment of the circuit court is affirmed.