HIBBERD v. SLACK.

(Circuit Court, S. D. California.   December 6, 1897.)

No. 696.

1. PUBLIC LANDS—INDEMNITY SCHOOL LANDS—FOREST RESERVATIONS.
    Rev. St. §§ 2275, 2276, as amended by Act Feb. 28, 1891, do not authorize a state to select indemnity lands in lieu of school lands which, after they have been surveyed and the title has thereby become vested in the state, are included within the exterior boundaries of a forest reservation.
2. SAME—SCHOOL LANDS WITHIN LIMITS OF RESERVATION.
    School lands the title to which has vested in a state by their survey are not thereafter subject to the disposal of congress, and, although included within the limits of a forest reservation, they are not a part of such reservation.
3. SAME—CONSTRUCTION OF STATUTE.
    Act Feb. 28, 1891, amending Rev. St. §§ 2275, 2276, does not contemplate an exchange of lands between a state and the United States, but only indemnity for loss to a state by reason of lands to which it is entitled being disposed of by the United States.

Action by I. Norris Hibberd against E. S. Slack.

Geo. E. Bates, for plaintiff.

Naphtaly, Freidenrich & Ackerman, for defendant.

WELLBORN, District Judge. This is an action of ejectment, for the recovery of the fractional S. W. ¼ of section 30, in township 6 N., of range 10 W., San Bernardino meridian, in Los Angeles county, Cal. The complaint alleges that on the 26th day of May, 1893, the surveyor general of California, acting as general agent of said state, and under authority of the act of congress of February 28, 1891, entitled "An act to amend sections twenty-two hundred and seventy-five and twenty-two hundred and seventy-six of the Revised Statutes of the United States, providing for the selection of lands for 'educational purposes in lieu of those appropriated for other purposes" (26 Stat. 796; 1 Supp. Rev. St. [2d Ed.] p. 898), selected said fractional quarter section, in lieu of certain sixteenth and thirty-sixth sections of school lands, which had been included within the limits of forest reservations created by order of the president of the United States, under authority conferred upon him by the twenty-fourth section of the act of congress of March 3, 1891 (26 Stat. 1095); that this selection was accepted by the commissioner of the general land office, under his interpretation of the aforesaid act of congress of February 28, 1891; that on the 14th day of February, 1895, one Anders Paterson purchased said land from said state, and thereafter, for a valuable consideration, sold and assigned his certificate of purchase to plaintiff, who is now the owner thereof; that on April 17, 1896, defendant, without authority of plaintiff, and against his will, took, and continues to hold, possession of said land, and excluded, and now excludes, plaintiff therefrom. The answer does not controvert the foregoing facts, but denies that said facts make plaintiff the owner of the land, or entitle him to the possession of the same. In the answer, the further defense is set up that two of the school sections, which were the basis of the selections of the lands sued for, were surveyed by the United States, before they were included within the forest reservations, and that the title to said sections thereupon became, and still remain, vested in the state of California. Plaintiff demurs to the answer, on the ground that the same does not state facts sufficient to constitute a defense to the action. These pleadings raise the following question of law, to wit: Is the state of California entitled to select other lands, in lieu of the sixteenth and thirty-sixth sections of school lands, situated within the exterior boundaries of a public reservation, where said sections were surveyed, and became the property of the state, prior to the date when the reservation was created?

The aforesaid act of February 28, 1891, as indicated by its title, is simply amendatory of sections 2275 and 2276 of the Revised Statutes of the United States, which sections, thus amended, are as follows:

"'Sec. 2275. Where settlements with a view to pre-emption or homestead have been, or shall hereafter be made, before the survey in the field, which are found to have been made on sections sixteen and thirty-six, those sections shall be subject to the claims of such settlers; and if such sections, or either of them, have been or shall be granted, reserved, or pledged for the use of schools or colleges in the state or territory in which they lie, other lands of equal acreage are hereby appropriated and granted, and may be selected by said state or territory, in lieu of such as may be thus taken by pre-emption or homestead set-

tlers. And other lands of equal acreage are also hereby appropriated and granted, and may be selected by said state or territory where sections sixteen or thirty-six are mineral land, or are included within any Indian, military, or other reservation, or are otherwise disposed of by the United States: Provided, where any state is entitled to said sections sixteen and thirty-six, or where said sections are reserved to any territory, notwithstanding the same may be mineral land or embraced within a military, Indian, or other reservation, the selection of such lands in lieu thereof, by said state or territory, shall be a waiver of its right to said sections. And other lands of equal acreage are also hereby appropriated and granted, and may be selected by said state or territory to compensate deficiencies for school purposes. where sections sixteen or thirty-six are fractional in quantity, or where one or both are wanting by reason of the township being fractional, or from any natural cause whatever.' And it shall be the duty of the secretary of the interior, without awaiting the extension of the public surveys, to ascertain and determine, by protraction or otherwise, the number of townships that will be included within such Indian, military, or other reservations, and thereupon the state or territory shall be entitled to select indemnity lands to the extent of two sections for each of said townships, in lieu of sections sixteen and thirty-six therein; but such selections may not be made within the boundaries of said reservations: Provided, however, that nothing herein contained shall prevent any state or territory from awaiting the extinguishment of any such military, Indian, or other reservation and the restoration of the lands thereto embraced to the public domain and then taking the sections sixteen and thirty-six in place therein; but nothing in this proviso shall be construed as conferring any right not now existing.

" 'Sec. 2276. That the lands appropriated by the preceding section shall be selected from any unappropriated, surveyed public lands, not mineral in character, within the state or territory where such losses or deficiencies of school sections occur; and where the selections are to compensate for deficiencies of school lands in fractional townships, such selections shall be made in accordance with the following principles of adjustment, to wit: For each township, or fractional township, containing a greater quantity of land than three-quarters of an entire township, one section; for a fractional township, containing a greater quantity of land than one-half, and not more than three-quarters of a township, three-quarters of a section: for a fractional township, containing a greater quantity of land than one-quarter, and not more than one-half of a township, one-half section; and for a fractional township, containing a greater quantity of land than one entire section, and not more than one-quarter of a township one-quarter section of land: Provided, that the states or territories which are, or shall be entitled to both the sixteenth and thirty-sixth sections in place, shall have the right to select double the amounts named, to compensate for deficiencies of school land in fractional townships.' "

1 Supp. Rev. St. (2d Ed.) p. 898.

Plaintiff contends that said act of February 28, 1891, so far as concerns the appropriation to and selection by a state of lands of equal acreage, in lieu of sections 16 and 36. included within a reservation, provides for two things: First, indemnity to said state for such of said sections as, before their surveys in the field, are included within a reservation, and thereby lost to the state; second, a plan by which the state may transfer or relinquish sections 16 and 36, after its ownership has become absolute by surveys in the field, to the United States, and obtain therefor other lands of equal acreage, where, subsequent to such surveys, a reservation has been created, whose exterior boundaries include said sections; this plan being, not a grant of lieu lands to compensate losses in school sections, but an exchange between the federal and state governments of lands which belong, respectively, to each. Defendant concedes the indemnity feature, as I have above distinguished it, of the act, but denies that said act gives to the state the right to select lands of equal acre-

age with the school sections, where the latter are included within the exterior boundaries of a reservation, subsequent to their survey in the field; that is, denies that the act provides for any exchange of lands between the federal and state governments. In a decision dated December 27, 1894, the then secretary of the interior, Hon. Hoke Smith, decided the precise question here involved adversely to plaintiff's contention: In re California, 19 Land Dec. Dep. Int. 585. Principles, however, contrary to those upon which that decision was based, have been subsequently applied, by the present secretary of the interior, in a decision bearing date January 8, 1897.

My opinion, after a careful consideration of the subject, is that plaintiff's construction of the act of February 28, 1891, so far as relates to an exchange of lands, cannot be maintained, although the reasons which have led me to this conclusion are different from those on which Secretary Smith rested his decision. In order to determine the question here involved, reference, of course, should be had first to the language of the act itself; and, if the intention of congress is clearly manifest therefrom, such intention will be enforced. Extrinsic aids to construction are decisive only where the language of a statute is obscure or ambiguous. To this effect, it has been well said:

"The cardinal rule of all statutory construction is that the meaning and intention of the legislature are to be sought for. This meaning and intention are to be sought, first of all, in the statute itself,—in the words which the legislature has chosen to express its purpose. If these words convey a definite, clear, and sensible meaning, that must be accepted as the meaning of the legislature; and it is not permissible to vary it, or depart from it, by reason of any considerations found outside the statute, or based on mere conjecture. In such case there is no room for construction. But if the words of the law are not intelligible, if there arises a substantial doubt as to their meaning or application, or if there is ambiguity on the face of the statute, then the endeavor must be made to ascertain the true meaning and intent of the legislature. And to this end, first of all, the intrinsic aids for the interpretation of the statute are to be resorted to. It should be read and construed as a whole. Its various parts should be compared. Each doubtful word or phrase is to be read in the light of the context. The interpretation clause, if there is any, should be examined to see if it defines or explains the ambiguous part; and light may be sought from the title of the act, the preamble, and even the headings of the chapters and sections. But if these intrinsic aids are exhausted without success, if there still remains a substantial doubt or ambiguity, then recourse may be had to extraneous facts, considerations, and means of explanation, always with the same object, to find out the real meaning of the legislature." Black, Interp. Laws, pp. 196, 197.

In construing the act of February 28, 1891, there are certain well-established principles of law, applicable to school sections, which should be constantly borne in mind, as follows: First. Title to a school section, if unincumbered at date of survey, then vests absolutely in the state. Cooper v. Roberts, 18 How. 173; Heydenfeldt v. Mining Co., 93 U. S. 634. And this is the principle recognized and acted upon by the department of the interior. In re Colorado, 6 Land Dec. Dep. Int. 412; In re Virginia Lode, 7 Land Dec. Dep. Int. 459; In re Miner, 9 Land Dec. Dep. Int. 408; 'Pereira v. Jacks, 15 Land Dec. Dep. Int. 273. After title has thus vested, the section is not subject to any further legislation by congress. Therefore the

school sections which were the bases of the selections of the lands sued for in the case at bar, although situated within the limits of forest reservations, are not parts of such reservations. Wilcox v. Jackson, 13 Pet. 513; Railroad Co. v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112. Second. Until the surveys in the field of the school sections, to wit, 16 and 36, the United States has full power of disposition over them; and, by the exercise of this power, said sections may be lost to the state. Hence, and through various enactments of congress, has arisen the law of indemnity, whose cardinal doctrine is compensation for loss. Thus, it has been said, "the principle upon which indemnity is given to a state is for a loss. It is not given for that which the state has already received." Poisal v. Fitzgerald, 15 Land Dec. Dep. Int. 19.

Plaintiff concedes, in his brief, that up to the act of February 28, 1891, compensation for loss was the only theory on which a state could acquire other lands in lieu of school sections, but contends that said act introduced a new arrangement,—"a statutory expedient,"—for an exchange of properties between the United States and a state, whereby the former could reacquire sections 16 and 36 after they had vested in the state; such expedient being not only "novel," but "contrary to the old maxim of indemnity law that indemnity is not allowed except for losses." In order that plaintiff's construction of said act may be clearly understood, I quote from his brief, as follows:

"The concluding sentence of the passage above quoted, from the decision of which review is asked, holds that the sections in question are not proper bases for indemnity, because they are not taken from the state; and in other passages it seems to be the understanding of the secretary that the state officers regard the inclusion of the sections within the reservation as an appropriation of them by the federal government, and ask for indemnity on the theory that the statutory exchange is forced upon the state. The real theory of those officers, on the contrary, is that the acceptance of indemnity for these sections is left entirely in the option of the state, and the exchange is not, and could not be, imposed upon them. And, so far as concerns the objection that the sections are not appropriated by the reservation, it is insisted on the part of the state that this is the essence of the new indemnity grant made by the act of 1891, and that the indemnity now claimed differs from all previous allowances of indemnity precisely in this fact: that it is not conditioned upon an antecedent loss or failure of the school grant, but is based upon a voluntary retrocession to the United States of lands to which the state has acquired title.

"It is claimed on behalf of the state that the school clause of the act of February 28, 1891, is intended to enable the United States to resume title to those surveyed school sections which are included within the forest reservations; and, to this end, indemnity is offered to the state, as an inducement to the surrender of her title in those sections, and the selection of indemnity is prescribed as a means and method of effecting such surrender. The motive which induced the United States to propose such an exchange of lands is sufficiently obvious. These forest reservations are established for the purpose of preserving the timber upon large areas of public land, and, to that end, it was, and is, pre-eminently desirable to eliminate from the reserved bodies the title of the state to the interspersed school sections. The expediency—one might say the necessity—of making the reservation a solid body of land, and the inconvenience—the actual peril—to the success of the forestry policy involved in allowing those sections to break the integrity of the reservation, have been urged in previous arguments. There is an injustice to the state in surrounding the sections with large tracts of land permanently and designed-

ly withdrawn from settlement, and the isolation of her lands must materially impair their value. * * *

"The irresistible conclusion is that the mineral lands and the sections in reservations, which are mentioned in the proviso, are in the same case; that both classes are lands included in the school grant, and vested in the state by survey; and that for such lands the United States proposes an exchange of title. That this is a novel provision, and perhaps an unexpected one, is readily conceded; and it is believed that the novelty of the statutory expedient makes the greatest difficulty in giving the proper construction to the act. We approach this enactment with strong preconceptions as to the nature of indemnity and the conditions of its allowance. The indemnity acts form a series beginning with the admission of Ohio, in 1802, and through many years the enactments of that character were substantially homogeneous in nature. The law of indemnity had in 1891 crystallized into a body of principles which were firmly established by long use, and had become almost venerable by their age. The more thoroughly one has studied this branch of the law, the more likely one is to be prepossessed against interpretations which involve contravention of such principles. The cardinal objection to the construction of the act of 1891 herein proposed is that it is contrary to the old maxim of indemnity law,—that indemnity is not allowed except for losses. Prior to that act no statute of general application had ever authorized a state to take indemnity in lieu of land which actually became vested in the state under the school grant. Lieu lands were given only for deficiencies in school sections, and no general provision existed for the exchange of such lands for public lands of the United States."

It may be well to state here that the preceding quotations, which I have referred to as parts of plaintiff's brief, are from an argument by C. A. Keigwin, Esq., of Washington, D. C., attorney for the state of California, on motion for a review of the decision of the secretary of the interior first above mentioned, and which argument plaintiff has appended to his brief, with the comment that it fully covers the points at issue herein. As a matter of convenience, such further references to that argument as may occur in this opinion will, like those above, be made to it as a part of plaintiff's brief.

Having thus stated plaintiff's contention, I will now assign the reasons why I am unable to concur therein.

1. The phraseology of the clause from which plaintiff derives the plan for an exchange of lands between the United States and the several states owning school sections cannot be fairly construed as making such an arrangement. This clause is as follows:

"And other lands of equal acreage are also hereby appropriated and granted, and may be selected by said state or territory where sections sixteen and thirty-six are mineral land, or are included within any Indian, military, or other reservation, or are otherwise disposed of by the United States: Provided, where any state is entitled to sections sixteen and thirty-six, or where said sections are reserved to any territory, notwithstanding the same may be mineral land or embraced within a military, Indian, or other reservation, the selection of such lands in lieu thereof, by said state or territory, shall be a waiver of its right to said sections."

The pivotal word of this clause is "included," and, to my mind, it refers, when read in the light of its immediate context, to those school sections which are constituent parts of a reservation, but not to those which, although shut in by its outer lines, are distinct from the reservation. This interpretation plaintiff combats, as follows:

"The word 'include' has two meanings. The first, which accords with its etymology, from 'claudere,' to shut, is 'to confine within; to shut up; to hold,—

as, the shell of a nut includes the kernel; a pearl is included in a shell.' Webster's Dictionary. The second, and derivative, meaning, is 'to comprehend; as, a genus the species, the whole a part.' In order to make this enactment applicable only to unsurveyed sections, we must interpret the word 'included' as meaning incorporated into the reservation, so as to form a constituent part of it. But this, as before remarked, is only a secondary and derivative meaning of the word. The primary sense implies a shutting in, the thing included being distinct from that which includes. The verb 'claudo' is habitually used in the classics in connection with the confinement of prisoners. 'Mare clausum' is a sea shut in by land, the sea being distinct from the including medium. And in this, its original sense, the word is presumably used, rather than in that secondary sense, which conveys the purely adventitious idea of incorporation and assimilation. These surveyed sections are certainly included in the reservation, hemmed in, embraced, surrounded, shut off, and segregated by the circumjacent reservation. It would be too much to say that such sections are not included, because they are not made part of the reservation. It is true that the word 'included' is broad enough to cover both classes of school lands,—the unsurveyed, which are included by being merged in the mass of unsurveyed lands; and the surveyed, which are included by being shut off and locked in by surrounding lands of different character. But the word can be applied to the former class only by an extension of its original meaning, while it must certainly apply to the latter class, because that class is within its primary, literal, and strictest sense."

The infirmity of this argument is its failure to consider that whether the word "include" is used in its primary or derivative sense depends largely, in many cases, as in the present, upon the immediate context; that is, the subject and object of the verb. This is illustrated with uncommon clearness by the very example which plaintiff quotes: "The shell of a nut includes the kernel." Webster defines a nut to be "the fruit of certain trees and shrubs, consisting of a hard shell inclosing a kernel." Thus, it appears that the word "shell," in the expression, "The shell of a nut includes the kernel," indicates with certainty that the verb "includes" has its primary meaning, namely, "to confine within, to shut up," etc. Suppose, however, that the expression were, "The nut includes the kernel." There, obviously, the verb "includes" would have its secondary signification, and imply that the kernel was a part of the nut.

Now, if the act of February 28, 1891, had provided that indemnity should be granted where the "exterior boundaries" of a reservation included sections 16 and 36, we might well conclude, unless there was something else in the statute to the contrary, that "included" was used in its primary sense; that is, "to confine within, to shut up, to hold." But the language of the act is that indemnity is granted where a "reservation" includes the school sections, or, rather, in the exact words of the statute, "where sections sixteen and thirty-six are * * * included within any * * * reservation." The word "reservation" shows that the word "included" is used in the secondary sense, as defined by Webster,—"to comprehend; as, a genus the species, the whole a part," etc.

Plaintiff, in his brief, seeks to fortify his position as to the meaning of the word "include," as follows:

"Taking up next the proviso which accompanies this grant of indemnity, there can be no possible doubt as to its meaning. The language is: 'Provided, where any state is entitled to said sections sixteen or thirty-six, or where said sections are reserved to any territory, notwithstanding the same may be min-

eral land or embraced within a military, Indian, or other reservation, the selection of such lands in lieu thereof, by said state or territory, shall be a waiver of its right to said sections.' The first remark to be made upon this proviso is that the word 'embraced' is used in place of the word 'included,' and is manifestly intended as a synonym, and to designate the same lands, or a part of the same lands. Whatever ambiguity might be found in the word 'included,' the word 'embraced' can mean only lands within the reservation, and not forming part of it. Though like may include like, the thing embraced is necessarily something different and distinct from that which embraces. It may be granted that a reservation includes reserved lands, but it could scarcely be said that a reservation embraces its constituent parts. The dullest sense understands that lands embraced in a reservation are distinct from the reserved lands which embrace them. If lands included within a reservation may be unsurveyed school lands absorbed in the reservation, the lands embraced in a reservation must be school sections, which cannot be absorbed, but retain their identity, and remain distinct from the embracing body."

Plaintiff is manifestly right in assuming that the word "embraced" is a synonym of "included." I cannot agree with him, however, as to the meaning he attaches to the word "embraced." As defined by lexicographers, and as commonly used, it has, among others, the two meanings already ascribed to the word "include." Webster, for instance, defines the word "embrace" thus:

"(3) To encircle; to encompass; to surround or inclose. ❋ ❋ ❋
"(4) To include as parts of a whole, or as subordinate divisions of a part; to comprehend,—as, natural philosophy embraces many sciences."

As I have already said, with reference to the word "include," in order to determine in which one of its meanings the word "embrace" is used, an ordinarily safe criterion is the immediate context of the word. And here, as with the word "included," the statute speaks of the school sections "embraced" within a "reservation," not within the "exterior boundaries" of a reservation.

It is a somewhat striking coincidence that congress itself has used this word "embraced," and with reference to grants of school sections, in a sense directly opposite to that insisted upon by plaintiff, and conformable to the latter of the above definitions. The act of February 22, 1889, for the admission into the Union of the two Dakotas, Montana, and Washington, granted to those states, for school purposes, sections 16 and 36, with the following proviso, in section 10 of said act:

"Provided, that the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants nor to the indemnity provisions of this act, nor shall any lands embraced in Indian, military, or other reservations of any character be subject to the grants or to the indemnity provisions of this act until the reservation shall have been extinguished and such lands restored to, and become a part of, the public domain." 25 Stat. 679.

It is obvious, that, in the proviso just quoted, the word "embraced" refers only to such lands as form constituent parts of the reservations.

Plaintiff takes no further notice of the words "otherwise disposed of," which occur in the granting clause now under consideration, than to say that they are immaterial to his argument. With this statement I am unable to agree. Said words refer to that part of the sentence which immediately precedes them, "or are included

within any Indian, military, or other reservation," and seem to imply that the inclusion within a reservation therein specified is such an inclusion as is a disposition of the land by the United States, which disposition, as conceded and before stated, could not be effected where the lands were surveyed before the reservation was created.

Plaintiff further insists that the word "entitled," as used in the proviso to the grant in question, means "having title," and that, as the state never acquired complete title until after survey, said proviso must refer to surveyed lands. This contention, I think, is not well taken. "Entitled" does not, ordinarily, have the meaning which plaintiff ascribes to it. When used to express the idea of ownership, it does not signify complete ownership, but merely a claim or right thereto. Thus, Webster defines the word:

"(2) To give a claim to; to qualify for, with a direct object of the person, and a remote object of the thing; to furnish with grounds for seeking,—as, an officer's talents entitle him to command. Burke."

"Entitled," therefore, refers to the inchoate claim before, rather than the absolute ownership after, survey. This interpretation is confirmed by the last clause of the sentence. "The selection of such lands in lieu thereof by said state or territory shall be a waiver of its right to said sections." This phraseology is not such as is commonly employed to designate the transfer or conveyance of a complete title to real estate. Indeed, it would be a striking anomaly to speak of a waiver of right to land, where it was intended to convey the idea of a transfer of absolute ownership. Moreover, the occasion of the proviso now under consideration, I think, is to be found in the next proviso to the act, which gives to or recognizes in any state or territory the right to await the extinguishment of the reservation, and to then take sections 16 and 36 in place; and this is the right which the state waives by selecting lieu lands.

2. Another unanswerable objection to plaintiff's construction of the act of February 28, 1891, is to be found in that part of said act which amends section 2276 of the Revised Statutes. It will be remembered that plaintiff, in his brief, concedes that the construction which he places upon the act of 1891 is "contrary to the old maxim of indemnity law,—that indemnity is not allowed except for losses." From this concession it follows, necessarily, that, if there is any clause in the act which shows clearly that it is not contrary to the "old maxim of indemnity law," then plaintiff's construction of the act is inadmissible. The act contains just such a clause, namely, the first clause of the first sentence of section 2276, as follows:

"That the lands appropriated by the preceding section shall be selected from any unappropriated, surveyed public lands, not mineral in character, within the state or territory where such losses or deficiencies of school sections occur."

The clause just quoted is new matter, introduced into the section by the very act which plaintiff claims is contrary to the old maxim, "that indemnity is not allowed except for losses"; and yet this clause, by an implication as irresistible as if the fact had been expressly affirmed, declares that the grants and appropriations of lands made by the act are limited to cases where there are "losses or defi-

ciencies of school sections." These qualifying words, I repeat, are a part of the same act which makes the grants and appropriations of indemnity lands, and show unquestionably that the legislative intent was to limit said grants and appropriations to cases where the school sections were lost to the state, either in whole or in part.

The case of Johnston v. Morris, 19 C. C. A. 229, 72 Fed. 890, cited by plaintiff, so far from being favorable to, is strongly against, his contention, for Judge Morrow evidently had prominently in view, in connection with the act of February 28, 1891, the maxim above stated, "that indemnity is not allowed except for losses." At page 895 of 72 Fed., and page 234, 19 C. C. A., discussing the decision of the secretary of the interior, Judge Morrow says:

"The secretary held that California took her school grant under section 6 of the act of March 3, 1853, and section 6 of the act of July 27, 1866; and that the indemnity provision of section 2275 of the Revised Statutes, as amended, was not applicable to selections made by the state in lieu of the swamp land lost from the school land grant, on the ground that it would be giving to the state an indemnity for a class of lands already donated to the state; and that the principle upon which indemnity is given to the state is for a loss, and not for that which the state has already received. This is a clear and forcible statement of the reason why the state is not entitled to make her indemnity selections for school lands which it had already received as swamp lands, but this reason does not apply to losses from the school grant by reason of sections sixteen and thirty-six being mineral lands. Where such sections are found to be mineral lands, there is an absolute loss of such lands to the state, and, to that extent, a clear and unconditional diminution of the school land grant."

Judge Morrow also quotes with approval, as showing the purpose of said act, from a report of the committee on public lands of the house of representatives, as follows:

"In the administration of the law, it has been found by the land department that the statute does not meet a variety of conditions, whereby the states and territories suffer loss of these sections, without adequate provision for indemnity selection in lieu thereof. Special laws have been enacted in a few instances to cover, in part, these defects with respect to particular states or territories; but, as the school grant is intended to have equal operation and equal benefit in all the public land states and territories, it is obvious the general law should meet the situation, and partiality or favor be thereby excluded. * * * The bill now framed will cure all inequalities in legislation; place the states and territories in a position where the school grant can be applied to good lands, and largest measure of benefit to the school funds be thereby secured." 22 Cong. Rec. p. 3465.

While the language of the act of February 28, 1891, is not so obscure nor ambiguous as to require extrinsic aids in its interpretation, it can but be observed that the above quotation accords fully with the construction which I have placed upon the language of said act; indeed, is virtually a contemporaneous statement by congress, speaking through its appropriate committee, of an intention to provide, through said act, for all states and territories having grants of school sections a uniform and general system of indemnity, whereby losses of any such sections might be compensated.

The considerations of public policy which have been earnestly pressed by plaintiff, namely, that the growth and security of timber upon the large areas of public land included within forest reservations would be promoted by extinguishing state titles to interspersed school sections, thus making the reservations solid bodies of land,

and also that the states would be benefited by selections of other lands in lieu of their school sections surrounded by large tracts of land permanently withdrawn from settlement, would, it may be conceded, if the act of February 28, 1891, was itself ambiguous, point with some force to a legislative purpose in harmony with such considerations. Since the act, however, declares unmistakably, as above shown, a contrary intent, courts are not at liberty to disregard, because of any extraneous matters, the meaning thus declared. Besides, plaintiff himself, in a supplementary brief, filed October 18, 1897, and as confirmatory of his theory, has called attention to an act of congress, which act, to my mind, indicates that the United States has never entered upon any general policy for extinguishing state and private ownership of school sections situated within the limits of forest reservations. The act referred to is one approved June 4, 1897, entitled "An act making appropriations for sundry civil expenses of the government for the fiscal year ending June thirtieth, eighteen hundred and ninety-eight. and for other purposes," and the particular provision relied on by plaintiff is as follows:

"That in cases in which a tract covered by an unperfected bona fide claim or by a patent is included within the limits of a public forest reservation, the settler or owner thereof may, if he desires to do so, relinquish the tract to the government, and may select in lieu thereof a tract of vacant land open to settlement not exceeding in area the tract covered by his claim or patent; and no charge shall be made in such cases for making the entry of record or issuing the patent to cover the tract selected: Provided, further, that in cases of unperfected claims the requirements of the laws respecting settlement, residence, improvements, and so forth, are complied with on the new claims, credit being allowed for the time spent on the relinquished claims." 30 Stat. 36.

This provision unquestionably makes an arrangement for exchanges of lands between the United States and settlers thereon; and it is noticeable that the phraseology is well adapted to the end in view, and strikingly different from that used in the act of February 28, 1891. In the provision just quoted, the land upon which it operates is described, not as being included within a reservation, but within the limits of a reservation. Again, the effect of the exchange is referred to, not as a "waiver" of the settler's right to the land, which the United States reacquires, but the words are, "The settler or owner may, if he desires to do so, relinquish the tract to the government," etc. In the provision just quoted, the phraseology is precisely suited to the arrangement contemplated, namely, an exchange of lands: while the language of the act of February 28, 1891, is wholly inapt for such a purpose. Moreover, careful study of the provision last quoted, in connection with other parts of the same act, leads me to believe that said provision was designed, not in furtherance of any such general policy as that insisted upon by plaintiff, but chiefly for the benefit of settlers.

Said act declares the purposes for which the forest reservations may be established as follows:

"All public lands heretofore designated and reserved by the president of the United States under the provisions of the act approved March third, eighteen hundred and ninety-one, the orders for which shall be and remain in full force and effect, unsuspended and unrevoked, and all public lands that may hereafter be set aside and reserved as public forest reserves under said act, shall

be as far as practicable controlled and administered in accordance with the following provisions: No public forest reservation shall be established, except to improve and protect the forest within the reservation, or to furnish a continuous supply of timber for the use and necessities of citizens of the United States; but it is not the purpose or intent of these provisions, or of the act providing for such reservations, to authorize the inclusion therein of lands more valuable for the mineral therein, or for agricultural purposes, than for forest purposes. * * * Upon the recommendation of the secretary of the interior, with the approval of the president, after sixty days' notice thereof, published in two papers of general circulation in the state or territory wherein any forest reservation is situated, and near the said reservation, any public lands embraced within the limits of any forest reservation which, after due examination by personal inspection of a competent person appointed for that purpose by the secretary of the interior, shall be found better adapted for mining or for agricultural purposes than for forest usage, may be restored to the public domain. And any mineral lands in any forest reservation which have been or which may be shown to be such, and subject to entry under the existing mining laws of the United States and the rules and regulations applying thereto, shall continue to be subject to such location and entry, notwithstanding any provisions herein contained." 30 Stat. 35, 36.

The act further provides as follows:

"The secretary of the interior may permit, under regulations to be prescribed by him, the use of timber and stone found upon such reservations, free of charge, by bona fide settlers, miners, residents, and prospectors for minerals, for firewood, fencing, buildings, mining, prospecting, and other domestic purposes, as may be needed by such persons for such purposes; such timber to be used within the state or territory, respectively, where such reservations may be located. * * * The settlers residing within the exterior boundaries of such forest reservations, or in the vicinity thereof, may maintain schools and churches within such reservations, and for that purpose may occupy any part of the said forest reservation, not exceeding two acres for each schoolhouse and one acre for a church." 30 Stat. 35, 36.

These quotations, so far from indicating a general policy on the part of congress to reacquire school sections situated within the limits of forest reservations, in order to make the reservations solid bodies of land, show clearly a purpose to except from the reservations even public lands so situated, where they are better adapted to mining or agricultural uses. However, as I have already stated, the language of the act of February 28, 1891, is so plain and unmistakable as not to require extrinsic aids in its interpretation. The demurrer to the answer will be overruled.