UNITED STATES v. COWLISHAW et al.

(District Court, D. Oregon. January 13, 1913.)

No. 3,866.

1. PUBLIC LANDS (§ 51*)—SCHOOL LANDS—GRANT—PASSING OF TITLE—TIME.
   Oregon Enabling Act Feb. 14, 1859, c. 33, 11 Stat. 383, provides that sections 16 and 36 in every township of public lands in the state, and where such sections, or any part thereof, have been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to the state for school purposes. *Held*, that such provision was not a grant of the lands in præsenti, and that the title did not pass to the state until the lands were identified by official survey and location.
   [Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 138, 146; Dec. Dig. § 51.*]

2. PUBLIC LANDS (§ 51*)—SCHOOL LANDS—IDENTIFICATION—SURVEY.
   Since Surveyors General are forbidden to file duplicate plats in the local land offices until after the plats have been examined in the General Land Office and approved, a field survey of public land in a township is not sufficient to designate the location of school sections, so as to vest title thereto in the state; such designation not being complete until the duplicate plats approved by the land office have been duly filed.
   [Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 138, 146; Dec. Dig. § 51.*]

In Equity. Suit by the United States against E. J. Cowlishaw and others. Judgment for plaintiff.

John McCourt, U. S. Atty., and Robert F. Maguire, Asst. U. S. Atty.

R. Sleight, of Portland, Or., for defendants.

WOLVERTON, District Judge. This is a suit to quiet the title to certain lands in the plaintiff against the claim of ownership and right to possession of the defendants. The lands are a part of school section No. 16, in township 3 S., range 6 E., of the Willamette meridian.

The facts as stipulated by counsel are as follows: Prior to May 27, 1902, the lands were unsurveyed lands of the United States. On that date a field survey of the east boundary of said lands was made, and on June 2d the north, west, and south boundaries were surveyed, and section 16 subdivided according to the rules of the Land Office in surveying the lands of the government. This field survey was approved by the United States Surveyor General of the state of Orgeon June 2, 1903, and on June 8th that officer transmitted copies of the plat of survey and field notes to the Commissioner of the General Land Office at Washington, D. C., and the survey was accepted by the Commissioner January 31, 1906. On November 16, 1907, the Commissioner directed the Surveyor General to place a plat of the survey in the field in the local land office of the United States at Portland, Or., which was on the same date accordingly filed in that office. On December 16, 1905, the Secretary of the Interior, by order, temporarily withdrew for forestry purposes, from all forms of disposition whatsoever, except under the mineral laws of the United States, all vacant and unappropriated public lands within a certain specifically described area, including said township 3 S., range 6 E., W. M., and the local land office was duly notified of such order. On January 25, 1907, the President of the United States issued a proclamation enlarging the Cascade Range Forest Reserve to include such lands, which, among other things, provided that all lands which at said date were embraced within any withdrawal or reservation for any use or purpose to which said reservation for forest uses was inconsistent were excepted from the force and effect of such proclamation.

On October 10, 1906, the state of Oregon, in pursuance of the laws for the disposal of lands owned by it, executed a certificate of sale to Robert F. Louden for the S. E. ¼ of said section 16, and to Alvina S. Louden a certificate for the S. ½ of the N. E. ¼ and the N. W. ¼ of the N. W. ¼ of said section; and they thereafter assigned and transferred said certificates of sale to Finley and W. J. Morrison. On January 9, 1907, the state of Oregon, on surrender of the certificates of sale, executed to these latter purchasers a deed granting and conveying to them the lands described. On July 12, 1910, Finley and W. J. Morrison conveyed to the defendant Sligh Furniture Company.

[1] Under the facts as thus stipulated, it is claimed by the government that at the time the state exercised authority to sell and dispose of such lands they were not school lands, but were the property of the government, and not subject to sale by the state. The defendants controvert this position, and claim to have acquired the fee-simple title in regular course. The question thus presented depends upon the proper construction of the clause in the enabling act of Congress for the admission of the state of Oregon into the Union, approved Febru-

ary 14, 1859 (Act Feb. 14, 1859, c. 33, 11 Stat. 383), pertaining to school lands, which reads as follows:

"That sections numbered sixteen and thirty-six in every township of public lands in said state, and where either of said sections, or any part thereof, has been sold or otherwise been disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said state for the use of schools."

The grant was accepted by the Legislative Assembly of the state June 3, 1859. The language of the act is "shall be granted." This has never been construed, that I am aware of, as a grant in præsenti, but it rather looks to the future, as depending on some future act or event, and as not to become effective until such act or event has taken place or happened. It is manifest that the act is not a grant of all sections 16 and 36 within the territorial limits of the state; for it provides that if such sections, or any part thereof, have been sold or otherwise disposed of other lands equivalent thereto, and as contiguous as may be, shall be granted. This again raises the inquiry as to when the grant is to become effective as an actual transfer of the lands to the state. As to the lands to be granted in the place of the school sections, or any part thereof, sold or otherwise disposed of, it is very plain that there could be no passing of title until they were identified by some approved method of selection from the public domain. In construing a similar statute (the enabling act of the state of Nevada, which employed the words "shall be and are hereby granted"), the Supreme Court was led to observe that:

"Her people were not interested in getting the identical sections 16 and 36 in every township. Indeed, it could not be known until after a survey where they would fall, and a grant of quantity put her in as good a condition as the other states which had received the benefit of this bounty. A grant, operating at once, and attaching prior to the surveys by the United States, would deprive Congress of the power of disposing of any part of the lands in Nevada until they were segregated from those granted." Heydenfeldt v. Daney Gold, etc., Co., 93 U. S. 634, 638 (23 L. Ed. 995).

In that case the state of Nevada issued a patent to plaintiff's predecessor July 14, 1868. The defendant claimed under a patent from the United States, issued March 2, 1874, under the act of Congress of July 26, 1866, as amended by an act approved July 9, 1870, and the act of May 10, 1872, relating to the development of the mining resources of the United States. The land in controversy was mineral land, and the defendant's grantors and predecessors had entered upon the same for mining purposes in 1867, prior to the survey or approval of the survey of the school section in which it was located, and had claimed the same in conformity with the laws and customs of miners in that locality. The enabling act for the admission of the state into the Union was adopted March 21, 1864. So it appears in that case that the land in dispute was entered upon for mining purposes subsequent to the adoption of the enabling act, at a time prior to a survey of the school section, but before the grant by the state to plaintiff's predecessor; and the question was fairly presented whether the title passed to the state at the time of its admission into

the Union, or at some future time, namely, the time of its identification in place by a proper survey. And it was held that:

"Until the status of the lands was fixed by a survey, and they were capable of identification, Congress reserved absolute power over them; and if in exercising it the whole or any part of a sixteenth or thirty-sixth section had been disposed of the state was to be compensated by other lands equal in quantity, and as near as may be in quality."

In an earlier case it was said, the court speaking with reference to the enabling act of the state of Michigan, almost identical in language with that of Oregon:

"We agree that until the survey of the township and the designation of the specific section the right of the state rests in compact, binding, it is true, the public faith, and dependent for execution upon the political authorities. Courts of justice have no authority to mark out and define the land which shall be subject to the grant. But when the political authorities have performed this duty the compact has an object, upon which it can attach; and if there is no legal impediment the title of the state becomes a legal title. The jus ad rem, by the performance of that executive act, becomes a jus in re, judicial in its nature, and under the cognizance and protection of the judicial authorities, as well as the others." Cooper v. Roberts, 18 How. 173, 179 (15 L. Ed. 338).

In a later case, Minnesota v. Hitchcock, 185 U. S. 373, 22 Sup. Ct. 650, 46 L. Ed. 954, the court treated of the significance of the words "public lands," and quoted as authoritative the language of the court in Newhall v. Sanger, 92 U. S. 761, 763 (23 L. Ed. 769), as follows:

"The words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws."

It then, after citing other authorities bearing upon the subject, proceeded to say:

"Again, the language of the section [referring to the Minnesota enabling act, identical with that of Oregon as to the grant of school lands] does not imply a grant in præsenti. It is 'shall be granted.' Doubtless, under that promise, whenever lands became public lands they came within the scope of the grant."

Later the court further commented:

"But while this is true it is also true that Congress does not, by the section making the school land grant, either in letter or spirit, bind itself to remove all burdens which may rest upon lands belonging to the government within the state, or to transform all from their existing status to that of public lands, strictly so called, in order that the school grant may operate upon the sections named. It is, of course, to be presumed that Congress will act in good faith; that it will not attempt to impair the scope of the school grant; that it intends that the state shall receive the particular sections or their equivalent in aid of its public school system. But considerations may arise which will justify an appropriation of a body of lands within the state to other purposes; and if those lands have never become public lands the power of Congress to deal with them is not restricted by the school grant, and the state must seek relief in the clause which gives it equivalent sections."

This was followed further in the opinion by a citation of the Heydenfeldt Case, indicating its holding, namely, "that the United States had full power to dispose of the land until after a survey and the identification thereby." Then, after referring to a joint resolution adopted by Congress on March 3, 1857, prompted by a memorial from the territory of Minnesota, the court concluded that:

"The act of admission, with its clause in respect to school lands, was not a promise by Congress that under all circumstances, either then or in the future, these specific school sections were or should become the property of the state. The possibility of other disposition was contemplated, the right of Congress to make it was recognized, and provision made for a selection of other lands in lieu thereof."

It would seem to be a logical deduction from these authorities, therefore, that the grant of the school sections does not vest the title thereof in the state until they have become identified through a survey determining their location. In further support of this view, see, also, Hibberd v. Slack (C. C.) 84 Fed. 571, and State of Oregon, L. D., decided July 5, 1912.

As to the case of Beecher v. Wetherby, 95 U. S. 517, 24 L. Ed. 440, there may be found expressions in the opinion seemingly opposed to this view; but the case itself does not appear to have been so considered by the Supreme Court in the Hitchcock Case, although commented upon at some length. Furthermore the case was decided subsequent to the Heydenfeldt Case, with but a year intervening, and, although cited in the briefs of counsel, it was not referred to in the opinion of the court, so that we cannot infer that it was the intention to overrule that case.

[2] The next question presented is whether a survey in the field is sufficient to meet the requirements of an identification of school sections by survey. That the Land Department has authority to make rules and regulations, subject to law, in all matters pertaining to the disposition of public lands, will not be questioned. And it is said that:

"From the earliest days matters appertaining to the survey of public or private lands have devolved upon the Commissioner of the General Land Office, under the supervision of the Secretary of the Interior"—citing Rev. Stat. § 453 (U. S. Comp. St. 1901, p. 257); Cragin v. Powell, 128 U. S. 691, 697, 9 Sup. Ct. 203, 206 (32 L. Ed. 566).

See, also, Knight v. U. S. Land Association, 142 U. S. 161, 177, 12 Sup. Ct. 258, 35 L. Ed. 974.

In the exercise of this power the Land Department on April 17, 1879, issued instructions to the Surveyors General that they should not file the duplicate plats in the local land offices until the duplicates had been examined in the General Land Office and approved, and the Surveyors General officially notified of that fact. Since such regulation, it has been held by the Secretary of the Interior, and it has become the practice of the Land Department, that public lands are not to be deemed surveyed or identified until approval of the plat of survey and filing thereof by direction of the Commissioner of the General Land Office in the local land office. F. A. Hyde & Co., 37 Land Dec. Dept. Int. 164, 165. This ruling has been specifically reaffirmed in a later case. Anderson v. State of Minnesota, 37 Land Dec. Dept. Int. 390, 392. See, also, State of Oregon, L. D. 259, supra.

The Land Department having adopted such a rule under clear authority of law, and having so interpreted it, and it having the stamp of reason and sound policy, there is little left for the courts to do but to apply it.

202 F.—21

In the case at bar the stipulation shows that, measured by this rule, there was no survey or proper identification of school section No. 16, township 3 S., 6 E., at the time the land was incorporated into the Cascade Reserve through withdrawal by the Commissioner, followed later by the proclamation of the President. Nor do I think that the lands in dispute were excepted from the operation of the proclamation.

The plaintiff is entitled to the relief as prayed; and it is so ordered.